In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00465-CV
_____


IN RE E.I. DU PONT DE NEMOURS AND COMPANY

_____

**Original Proceeding**

_____

**OPINION**

At issue in this mandamus proceeding is whether the judge of the 172nd Judicial District Court of Jefferson County abused his discretion in disregarding the jury verdict in favor of DuPont[1] and in granting a new trial in favor of Willis Whisnant's estate and beneficiaries (collectively "Whisnant")[2]. In September 2014,

_____

[1]E.I. duPont de Nemours and Company shall be referred to as "DuPont" or "Relator," or "Defendant."

[2]Willis N.Whisnant, Jr. is deceased. Caryl Richardson is acting "Individually and as Independent Executrix of the Estate of Willis N. Whisnant, Jr., and as representative for all of the wrongful death beneficiaries of Willis N. Whisnant, Jr," including: Caryl Richardson, Michael Whisnant, Lydia R. Stafford, Richard A.

1

almost six years after the jury returned its verdict, finding "no" in response to the broad form negligence question, and after a previous mandamus proceeding and eventually a remand from the Texas Supreme Court, the trial court once again granted Whisnant's motion for new trial and ordered a new trial stating that "[t]he jury's answer to Question 2 as to [DuPont] is against the great weight and preponderance of the evidence."

We have conducted a merits-based mandamus review of the trial court's articulated reasons for granting the new trial. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 755-59 (Tex. 2013). We conclude that the record does not support the trial court's rationale for ordering a new trial. Therefore, we hold the judge of the 172nd Judicial District Court of Jefferson County abused his discretion when he granted the motion for new trial, and we conditionally grant mandamus relief.

BACKGROUND

From 1947 through 1986, Willis Whisnant Jr. (Willis Whisnant or Mr. Whisnant) worked as a pipefitter at various plants where he alleged he was exposed to airborne asbestos fibers. From 1966 through 1975, Mr. Whisnant

_____
Whisnant, and Cheryl D. Parker. The estate and beneficiaries will be referred to collectively as "Whisnant" or "Real Parties in Interest," or "Plaintiffs."

2

worked "off and on" on DuPont's Sabine River Works premises in the course of his employment with a contractor, B.F. Shaw.

Mr. Whisnant was first diagnosed with lung cancer in 1997, and he filed a personal injury lawsuit regarding asbestos exposure in 1998. Mr. Whisnant died on or about June 16, 1999, before his suit was called for trial. His death certificate listed his cause of death as lung cancer. Mr. Whisnant also had a forty year smoking history. Approximately nine years after Whisnant's original petition was filed, Whisnant's counsel engaged additional experts who challenged the lung cancer diagnosis, and Whisnant's experts reached the conclusion that Whisnant died from mesothelioma rather than lung cancer. In December 2007, an amended petition was filed expressly pleading that Mr. Whisnant died from mesothelioma. In March 2008, after a five-week trial, the jury failed to find that the negligence of DuPont was a proximate cause of injury to Willis Whisnant Jr.[3] The trial court

---

[3]Question 2: Did the negligence, if any, of the persons named below proximately cause the injury in question?

With respect to the condition of the premises, E.I. DuPont de Nemours & Co. was negligent if--

a. the condition posed an unreasonable risk of harm, and

b. E.I. DuPont de Nemours & Co. had actual knowledge of the danger, and

c. E.I. DuPont de Nemours & Co. failed to exercise ordinary care to protect Willis N. Whisnant, Jr. from the danger, by both failing to adequately warn Willis N. Whisnant, Jr. of the condition and failing to make that condition reasonably safe.

3

signed a take-nothing judgment on April 17, 2008, and then the trial court granted Whisnant's motion for new trial without providing any detail or reasons for granting the new trial and setting aside the take-nothing judgment. The Texas Supreme Court granted mandamus relief, ordering the trial court "to specify the reasons for which it disregarded the jury verdict and ordered a new trial." *In re E.I. du Pont de Nemours & Co.*, 289 S.W.3d 861, 862 (Tex. 2009). After the matter was remanded to the trial court, the trial court then signed another take-nothing judgment on August 15, 2014. Whisnant then filed another motion for new trial, which the trial court once again granted, stating that the jury's failure to find liability as to DuPont was against the great weight and preponderance of the evidence.

---

"Ordinary care," when used with respect to the conduct of E.I. DuPont de Nemours & Co. as an owner of a premises, means that degree of care that would be used by an owner of ordinary prudence under the same or similar circumstances.

"Negligence," when used with respect to the conduct of Willis N. Whisnant, Jr., means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of Willis N. Whisnant, Jr., means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" for the following:
E.I. DuPont de Nemours & Co.:  No
Willis N. Whisnant, Jr.:          No

4

ISSUES FOR MANDAMUS REVIEW

DuPont raises six related issues in its mandamus petition, each challenging the trial court's order granting the new trial. First, DuPont contends the trial court failed to apply the law properly, when it decided a great-weight issue by considering evidence only on one side of the issue. DuPont argues the trial court abused its discretion by ignoring the evidence supporting a verdict in favor of DuPont. Second, DuPont argues the record contains ample evidence supporting the jury's verdict. Third, DuPont contends that the record shows clear error by the trial court because the record of the trial contains substantial evidence, which the jury was entitled to credit, directly controverting and undermining the credibility of the evidence recited in the trial court's order. Fourth, DuPont argues the trial court failed to provide a reasonable explanation for concluding that the evidence contrary to the verdict so outweighed the evidence supporting the verdict as to render the verdict manifestly unjust. DuPont argues the order, which the trial court adopted verbatim from Whisnant's proposed order, is not entitled to deference and provides neither a reasonable explanation nor a legally valid reason for disregarding evidence in the record. DuPont argues that setting aside the jury's non-finding on an issue on which Whisnant had the burden of proof required Whisnant to conclusively establish DuPont's liability. Fifth, DuPont contends it is

5

entitled to mandamus relief because it cannot appeal the trial court's granting of a new trial. Sixth, DuPont contends the remedy for the erroneous granting of a motion for new trial is for this Court to direct the trial court to render a take-nothing judgment on the jury's verdict. In the alternative, DuPont asks this Court to require the trial court to explain its ruling with reference to the evidence adduced at trial both supporting and opposing the verdict. Because we consider DuPont's stated issues to be essentially interrelated subparts of whether or not the trial court abused its discretion in granting the new trial, we find it unnecessary to address each issue individually.

Whisnant argues this proceeding presents a single issue, that is, whether the trial court abused its discretion by granting the motion for new trial. According to Whisnant, the mandamus record is insufficient for this Court to determine whether the trial court abused its discretion because it contains a mixture of documents commonly found in the clerk's record of an appeal and daily transcripts of testimony rather than a properly authenticated transcript of any relevant testimony. Whisnant argues the record fails to establish that the trial court did not consider the evidence supporting the jury's verdict. Whisnant suggests this Court should summarily reject DuPont's complaint that the trial court failed to discuss DuPont's evidence in the order because the trial court was not required to set out a detailed

analysis of the evidence. Whisnant asserts that DuPont seeks to expand the Texas Supreme Court's recent holdings regarding mandamus review of orders granting a new trial, and argues the trial court's order reveals reasons for granting the motion for new trial that are understandable, reasonably specific, and supported by the record.

## STANDARD OF REVIEW

"[T]he long-established precedents in this state demonstrate respect for jury verdicts." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). The "significant discretion" of a trial court to grant a new trial "should not, and does not, permit a trial judge to substitute his or her own views for that of the jury without a valid basis." *In re Columbia Med. Ctr. of Los Colinas*, 290 S.W.3d 204, 212 (Tex. 2009). "Appellate courts must be able to conduct merits-based review of new trial orders. If, despite conformity with the procedural requirements of our precedent, a trial court's articulated reasons are not supported by the underlying record, the new trial order cannot stand." *Toyota Motor Sales*, 407 S.W.3d at 758. A trial court must explain with reasonable specificity why it has set aside a jury verdict and granted a new trial, and the appellate court may, in an original proceeding, determine whether the reasons given by the trial court are reasonably specific and legally sound, and whether the rationale is true. *Id*.

7

Our mandamus review must be mindful of the different roles of the jury, the trial court, and the appellate court. As stated by one of our sister courts:

> In a mandamus proceeding, we may not substitute our judgment for that of the trial court. But neither may the trial court substitute its judgment for that of the jury in granting a new trial. The method for ensuring that the trial court does not substitute its judgment for that of the jury, is [for the appellate court] to confirm that the court's reasons for granting a new trial are valid and correct, i.e., supported by the trial record.

*In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 152 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. filed]) (citations omitted). If, after a review of the record of the trial, the appellate court determines that the record does not support the trial court's stated reasons for granting the motion for new trial, then the trial court will have abused its discretion in granting a new trial based on factual sufficiency. *Id.*

When a party attacks the factual sufficiency of an adverse finding on an issue on which that party had the burden of proof, the party must demonstrate that, considering all of the evidence, the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). A verdict can be set aside "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* The jury's failure to find a fact cannot be taken away

8

by the trial court simply because the trial court concludes that the evidence preponderates toward an affirmative answer. *Herbert*, 754 S.W.2d at 144. A "no" answer does not have to be supported by a preponderance of the evidence or even affirmative evidence, because to require such would incorrectly shift the burden of proof. *Clophus v. General Motors Corp.*, 769 S.W.2d 669, 670 (Tex. App.—Houston [14th Dist.] 1989, no writ).

Finally, when reviewing a jury verdict, it is the jury that weighs the credibility of the witnesses and the jury may choose to believe all, some, or none of the testimony from the witnesses. In a jury trial, the jury is the fact finder and sole judge of the credibility of the witnesses and of the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the jury may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). A reviewing court "must not merely substitute its judgment for that of the jury." *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

## SPECIFICITY OF THE ORDER

Initially, we must determine whether the trial court's order is sufficiently specific to permit this Court to review it. Even if the order is sufficiently specific,

9

the order granting a motion for new trial must also state a reason that is legally appropriate, such as a well-defined legal standard or a defect that probably resulted in an improper verdict, and must be "specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand." *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688-89 (Tex. 2012). The trial court "need not provide a detailed catalog of the evidence" but the trial court's order must provide "a cogent and reasonably specific explanation of the reasoning that led the court to conclude that a new trial was warranted." *Id.* at 688. The Supreme Court has provided a non-exhaustive list of examples when a trial court clearly abuses its discretion which includes: giving a reason (specific or not) that is not legally valid, giving statements that reflect the trial court merely substituted its own judgment for that of the jury, giving an explanation that provides no insight into the reasoning of the trial judge, statements that the trial court disliked a lawyer, invidious discrimination, or adopting a "pro forma" template or language that is absent of the trial court's analysis. *Toyota Motor Sales*, 407 S.W.3d at 756, n.6.

In this case, the trial court's new trial order is six pages long, and the order lists multiple examples of evidence from the record that the trial court states

10

supports the new trial; and, it further states that, "while not an exhaustive list of all evidence adduced at trial, . . . [it] is of such great weight and preponderance that a new trial is warranted[.]" According to the trial court, the great weight and preponderance of the evidence supports "only the answer 'Yes'" and "there is not legally or factually sufficient evidence to support the jury's answer of 'No'" to the broad-form negligence question based on a theory that the actions or omissions of some other party was the sole proximate cause of the injuries. Furthermore, the trial court states in the order that "[b]ecause the great weight and preponderance of the evidence supports only the answer 'Yes' to Question Number 2 as to DuPont, and since there is not legally or factually sufficient evidence to support the jury's answer of 'No' to Question Number 2 as to DuPont, for the reasons set forth above, the Court GRANTS Plaintiff's Motion for New Trial." We conclude that the order granting the new trial provides a "*reasonably specific* explanation of the reasoning that led the court to conclude that a new trial was warranted." *Id.* at 756. Furthermore, we conclude the trial court's order granting Whisnant's motion for new trial is sufficiently specific to allow DuPont to attack the order in this mandamus proceeding. *See id.* at 757. Nevertheless, we must also examine the trial court's stated reasons to determine whether or not the reasons are valid and correct, i.e. supported by the record. *Id.* at 759-60.

## SUFFICIENCY OF THE MANDAMUS RECORD

Whisnant contends that DuPont has not furnished "a properly authenticated transcript of any relevant testimony from any underlying proceeding[.]" *See* Tex. R. App. P. 52.7(a)(2). Therefore, before we proceed to examine the reasons stated by the trial court, we must determine whether the mandamus record is sufficient for this Court to evaluate the reasons articulated in the order granting the motion for new trial. *Toyota Motor Sales*, 407 S.W.3d at 758. DuPont's mandamus record contains the exhibits that Whisnant attached to the motion for new trial, and the exhibits that DuPont attached to its response in opposition to the motion for new trial. Whisnant's proof for the motion for new trial included excerpts from the court reporter's daily copy of witnesses' testimony and exhibits from the trial. Whisnant's counsel of record certified in an affidavit, based on personal knowledge, that the exhibits attached to the motion for new trial were "true and correct" copies of the witnesses' trial testimony and the trial exhibits. DuPont also attached the court reporter's daily copy of the trial testimony to its response to the motion for new trial, and DuPont's counsel of record certified in an affidavit, based on personal knowledge, that the exhibits attached to DuPont's response to the motion for new trial were true and correct copies of the daily transcript of proceedings and the trial exhibits. We find no indication in the mandamus record

12

of any material dispute regarding the accuracy of any part of the record while the case was before the trial court.

Furthermore, counsel of record for DuPont in this original mandamus proceeding certified by affidavit the accuracy of the mandamus record. Counsel for the real party in interest states that the appendix and record excerpts contained in the mandamus response are "the documents as described in the Index of the Appendix." Counsel for DuPont further certified that every factual statement in the petition is supported by competent evidence included in the mandamus record. *See* Tex. R. App. P. 52.3(j). Neither the relator nor the real party in interest describes or makes reference to any trial exhibit or any part of any witness's trial testimony that has been omitted but would be important to our analysis, and neither party identifies any testimony in the mandamus record that was inaccurately transcribed in the court reporter's daily copy.

Notwithstanding the affidavit provided by Whisnant's counsel when the trial court had the case, Whisnant argues in this mandamus proceeding that the record is not "properly" authenticated because the testimony and exhibits were not prepared as a certified record of the court reporter. The mandamus record must include a record of the trial court proceedings for the appellate court to ascertain whether a trial court abused its discretion in granting a motion for new trial because the jury's

verdict was against the great weight and preponderance of the evidence, and to determine whether a valid basis exists for the trial court's order. *See United Scaffolding*, 377 S.W.3d at 690; *In re Wyatt Field Service Co.*, No. 14-13-00811-CV, 2013 WL 6506749, at *3 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, orig. proceeding) (mem. op.). The same documents that were before the trial court when it made its decision on the motion for new trial are before the Court in this mandamus proceeding, and neither party has shown that the trial court made its decision on the motion for new trial based upon a personal recollection of the trial that differs from the record now before us in this mandamus proceeding. We conclude that DuPont furnished a properly authenticated transcript of the testimony at issue in this mandamus proceeding. *See* Tex. R. App. P. 52.7(a)(2).

## EVIDENCE PRESENTED AT TRIAL

We examine the evidence and testimony identified by the trial court, as well as the remaining testimony in the record before us, to determine if the trial court's stated reasons in its order support the granting of a new trial. *See Toyota Motor Sales*, 407 S.W.3d at 758. The trial court's order granting Whisnant's motion for new trial identifies certain evidence that the trial court considered to be "of such great weight and preponderance that a new trial is warranted[.]"

14

The evidence cited by the trial court in the order included references to portions of the testimony from two co-workers, Carl Gantt and Bobby Shugart, who worked with Willis Whisnant at DuPont's Sabine River Works. Gantt and Shugart testified that they were exposed to dust from pipe insulation while working on DuPont's premises and DuPont did not warn them that asbestos was deadly. According to Gantt, approximately fifty percent of the time they were around insulators who were cutting or knocking off insulation. When the insulators cut the insulation, it looked "like a snow cloud." Sometimes the pipefitters had to knock off insulation themselves. Prior to the early 1980's, no one wore a mask. Shugart stated that Willis Whisnant would have been within twenty feet of insulators approximately twenty percent of the time. According to Shugart, dust from cutting the insulation formed a light mist that was visible in the air. Shugart stated that the carpenters added to the dust by banging boards together when they moved scaffolding.

Nevertheless, there was other evidence in the record which the jury could have considered when weighing the weight and credibility of Gantt's and Shugart's testimony regarding the working conditions at DuPont and Willis Whisnant's level of exposure to inhaled asbestos fibers on DuPont's premises. On cross-examination, DuPont's counsel established that each witness had an active asbestos

15

lawsuit, and that the same lawyers who represent Whisnant also represent the witnesses in their suits. Shugart was also suing DuPont on a hearing-loss claim. In weighing the credibility of the witnesses, the jury could have considered it to be important that neither Gantt nor Shugart was completely disinterested. *See Magana v. Citibank, N.A.*, No. 14-13-00530-CV, 2014 WL 7405722, at *10 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (the jury may resolve inconsistencies in the testimony of any witness and is not bound by the testimony of an interested witness even if it is uncontradicted).

Furthermore, there was some testimony that each witness may have only worked with Willis Whisnant during specific projects, on a sporadic basis. Gantt worked with Willis Whisnant "off-and-on" from approximately 1968 through 1974. And, before he became a journeyman in 1970, Gantt apprenticed in the shop and never saw Willis Whisnant working there. Willis Whisnant and Gantt worked together for what Gantt described as four to six weeks at a compressor building, for approximately six months on what Gantt referred to as the C-line, and six to eight months on the ethylene unit. Shugart never saw Willis Whisnant in the shop where Shugart usually worked and the two men worked together in the boilerhouse for only two months during a shutdown. The jury also heard additional testimony it could have considered in deciding how much weight to give Gantt's and Shugart's

description of the exposure to asbestos fibers experienced by workers at the Sabine River Works. For example, Shugart indicated that DuPont was famous for insulating pipe before it got to the field to be installed by the pipefitters, and he agreed that DuPont would not continue a practice of pre-insulating pipe if it was routinely damaged by them. According to Shugart, with the exception of flanges, insulation was installed in the insulation shop. Shugart testified that the carpenters' scaffolds were lined with asbestos "A-cloth" for as long as he worked at the Sabine River Works, but DuPont produced a 1967 memorandum which called for the replacement of asbestos cloth with neoprene-coated fiberglass because it had greater fire-resistant properties.

Additionally, Gantt and Shugart each acknowledged that DuPont issued every worker a pocket-sized safety manual, called the "Blue Book." DuPont produced an August 1967 edition of the "Blue Book" that stated that a dust mask or respirator was required in an extremely dusty atmosphere, when sweeping, and for all prolonged or continuous exposure to dust. Shugart stated that he never wore a mask and that they did not need them in the shop where he worked. Although he did not recall using a dust mask, in a response to a request for admission filed in Shugart's own lawsuit he represented that he used a mask beginning in the early to mid-1960's. Gantt stated that a worker always goes to the foreman for information

17

and he never saw Willis Whisnant ask DuPont for any information about how to do his job.

The trial court's order granting Whisnant's motion for new trial also refers to the testimony of DuPont's retained expert, Dr. Morton Corn, that the working conditions described by Gantt and Shugart would expose workers to unsafe levels of asbestos. The record shows that Dr. Corn stated that if Gantt and Shugart were correct when they described conditions of "eight hours a day, five days a week, 50 weeks a year, for a year, all the time they were in this mist, in this dust, the industrial hygiene program would be a failure and the [threshold limit value] would be exceeded." But, Dr. Corn added, "I have never seen conditions like that anywhere, no less at DuPont, persist for that duration of time and I believe it may have happened on occasion in an episodic occurrence where procedures fail but certainly these men were not living in those conditions all their working life."

In its order, the trial court also mentioned testimony by DuPont's corporate designee, Dr. Bruce Karrh, that DuPont knew by the 1940's that exposure to asbestos could cause lung cancer, and that DuPont knew by the 1950's that exposure to asbestos could cause mesothelioma. According to Dr. Karrh, in the 1950's and 1960's it was thought that disease occurred in workers who were heavily exposed in the milling and mining industries. In 1960 or 1961, three

18

DuPont employees, Drs. Fleming, D'Alonzo and Zapp, published a book, *Modern Occupational Medicine*, and another DuPont employee, Dr. Schepers, contributed a chapter, "Occupational Chest Diseases," that stated that asbestosis is provoked wherever exposure to asbestos dust occurs. Dr. Schepers wrote, "Pulmonary carcinoma has been observed with such high frequency in employees of the asbestos industry that a causal relationship has been accepted by most authorities." He also wrote, "Pleural mesothelioma is also quite prevalent, especially in crocidolite industries." Dr. Karrh stated that about 1964 DuPont first became aware that people who were working in other industries, including people using asbestos in the way that asbestos would have been used in a DuPont-type of plant, might be experiencing asbestos-related medical conditions. According to Dr. Karrh, DuPont thought the occupations most at risk for developing asbestos-related disease were the insulators and laggers who worked with asbestos. Dr. Karrh stated that the thinking at that time was that pipefitters would be at a lesser risk of potential exposure to inhaled asbestos because their work did not entail working with asbestos all of the time, and in the mid-1960's it was not thought that people other than insulators and laggers could get mesothelioma from exposure to asbestos in DuPont-type operations.

Next, the trial court's order references Dr. Ellenbecker, an industrial hygienist, who testified as an expert for Whisnant. Ellenbecker testified that based upon published literature of sampled results and the co-workers' descriptions of snow-like, visible dust in the air, in his opinion Willis Whisnant's exposure would have exceeded the permissible exposure limit of 5 million particles per cubic foot on many occasions. Ellenbecker also described three engineering controls for asbestos.

According to Ellenbecker, "substitution" is the first control within the hierarchy of controls, and he acknowledged that DuPont did move away from using asbestos. He stated the next control is "isolation," which in this case would mean having the insulators complete their work before the pipefitters came into the area. The third control, "ventilation," would involve either placing an exhaust hood near the dust generation point and venting the exhaust past the workers' breathing zone, or wetting down the material before it is cleaned up. Ellenbecker stated that in addition to the engineering controls DuPont should have implemented administrative controls by warning everyone in the facility who had any chance of working with asbestos that asbestos is a carcinogen because the workers would have treated the material differently if they had known. Ellenbecker stated that he is not an expert on the design of warnings, but in his opinion DuPont's Blue Book

20

safety manual provided an insufficient warning for asbestos exposure because it was nonspecific. Another administrative control would be to label asbestos-containing materials. According to Ellenbecker, proper workplace practices would be to train the pipefitters to wait until the insulators were done and to train the pipefitters to have the insulators return to remove small pieces of insulation rather than to knock it off the pipe themselves. Additional administrative controls include monitoring exposure levels and medical monitoring. The last control in the administrative hierarchy would be to have workers wear respirators as a last resort if the other controls are not working.

The record before us indicates that the jury heard testimony about DuPont's controls. Dr. Karrh testified that by the 1940's pipefitters and laborers were not exposed to asbestos-containing dust because at DuPont, housekeeping was considered an essential part of safety and any dust was considered to be a bad thing from a safety standpoint. Dust was suppressed as soon as it was detected. At DuPont in the 1960's the insulators would remove the insulation before the pipefitters came in to work on the pipes, then the insulators would come back in and reapply the insulation.

The jury also heard and could have considered evidence from other witnesses who testified that DuPont implemented programs to protect its

21

employees and its contractors' employees from exposure to dust. For example, Kenneth Keuper, a safety engineer who worked at DuPont through September 1968, stated that effective in June 1968 DuPont eliminated the use of all crocidolite asbestos and implemented a dust control program that required air monitoring, respiratory protection, exhaust ventilation, and use of vacuums.

Nelson Derrick, who was employed with DuPont in 1949, and worked as a construction division safety representative for the Sabine River Works from 1955 until 1991, also testified. According to Derrick, the majority of the activities in the dust collection program were already in use in 1968. Derrick stated that by that time DuPont was already wetting down floors to reduce dust and they did not permit anyone, including carpenters and insulators, to work overhead of anyone else.

Jim Gaskins also testified on behalf of DuPont. Gaskins worked as a safety inspector at the Sabine River Works plant. Gaskins indicated that, in the context of the knowledge they had at the time, with respect to the use of insulation products, he believed the products were handled safely. Unless the pipes were pre-insulated, the pipefitters did their work first and the insulators followed behind. According to Gaskins, the insulators would barricade the area while they were working with the material, because DuPont did not want the workers to be exposed to the dust

22

generated in the process of removing the insulation. Furthermore, he said that the operating facilities had to be free of dust to avoid contaminating the products, and that DuPont's dust suppression measures included placing tarps with exhaust fans and wetting down the area. While he was working at the Sabine River Works, Gaskins knew asbestos might be a problem with insulation, but he was not aware that it was deadly and to his recollection up to the time he retired he had not told anyone that exposure to asbestos could cause them cancer or permanent lung disease. The trial court referred to Gaskins's statement that he did not tell anyone that asbestos could cause them cancer or permanent lung disease as part of what the trial court considered to be "overwhelming evidence" that DuPont failed to adequately warn Whisnant.

In the order granting Whisnant's motion for new trial, the trial court states that Bill Campbell testified that by 1975 nobody from DuPont had warned contractor employees at the Sabine River Works that exposure to asbestos could cause cancer, but we note that in the record Campbell also explained that he was not aware that they had ever put anyone in a situation where asbestos exposure had created a hazard to them. Additionally, Campbell testified that he had worked as a division engineer at the Sabine River Works beginning in 1973. He testified that as part of DuPont's dust suppression efforts they employed specialized sweepers who

23

used sweeping compound to reduce dust. Furthermore, Campbell testified that DuPont utilized job sequencing that prevented the pipefitters from being in the area during scaffolding and insulating activities. He recalled that in 1973 DuPont used special equipment when they removed asbestos insulation. And, according to Campbell, the flange covers were prefabricated in the insulation shop, and B.F. Shaw had its own pipe fabrication shop that was separate from and some distance away from the insulation shop. Campbell testified that by 1973 DuPont was using asbestos-free insulation.

The trial court's order generally cites James Lillie's testimony as additional evidence that DuPont failed to adequately warn Willis Whisnant or other contract employees. From 1973 to 1976, Lillie worked at the Sabine River Works as an instrumentation specialist and a construction area engineer. According to Lillie, he was aware of the hazards of asbestos in 1973 but he could not recall receiving formal training regarding the hazards of asbestos. Lillie stated that he was not aware of anyone from DuPont discussing asbestos with anyone from B.F. Shaw.

In the order granting the motion for new trial, the trial court refers to two physicians, Drs. Friedman and Hammar. The trial court states that testimony of Dr. Friedman established that "exposure to DuPont was a substantial factor in causing [Whisnant's] mesothelioma," and "that numerous medical doctors such as

24

[]Friedman and []Hammar testified that each exposure to asbestos contributed to Mr. Whisnant's mesothelioma, and that therefore his exposures at DuPont were at least a proximate cause of the mesothelioma, even if there were other proximate causes."

Both Drs. Friedman and Hammar were presented as experts on behalf of Whisnant. Dr. Friedman testified that he was contacted by Whisnant's attorney who asked Friedman to "take a look at this file." Initially Dr. Friedman told Whisnant's attorney "no" and then when he received several boxes of files from the attorney he told the attorney again, he did not want to work on the case. But, Dr. Friedman testified that he reviewed the medical records and that there were pleural plaques shown on Whisnant's lung x-rays. Dr. Friedman agreed that the pathologist controls the diagnosis. Dr. Friedman further agreed that the prior diagnosis was lung cancer, but he stated that if someone has asbestosis, then "automatically the lung cancer is attributable to asbestos."

Dr. Samuel Hammar, a pathologist, testified that in 1997 the treating physician diagnosed Willis Whisnant with lung cancer, and that such diagnosis was based on pathology. Hammar also agreed that the death certificate states that Willis Whisnant's cause of death was lung cancer probably caused by smoking.

25

And further, Hammar admitted that a diagnosis of mesothelioma was first suggested many years later, a few months before the trial.

Dr. Hammar explained that he was also first contacted by Whisnant's attorney, who suggested to him that Dr. Friedman had reviewed the records and that the cancer had initially been diagnosed as an adenocarcinoma and Friedman thought it looked more like "mesothelioma." Dr. Hammar agreed that typically mesothelioma is diagnosed through cytology specimens of pleural fluid. He stated that a fine-needle aspiration biopsy had been performed on Willis Whisnant in 1997. Whisnant's attorney sent Hammar the slides that were available. When Hammar received the slides, both had been previously stained but were in good condition. However, there was no paraffin block. In Dr. Hammar's opinion, it is not possible to tell from a given slide whether a cancer is lung cancer or mesothelioma. Based on the existing staining for the slides in this case, Dr. Hammar could only say that it was a malignant epithelial neoplasm, cancer, not otherwise specified. Dr. Hammar testified that he then subjected the slides to a technique where he soaked the slide to remove the cover slip, and then he placed the slide in an automatic immunohistochemistry staining machine and tested for Thyroid Transcription Factor 1 and calretinin. Based on receiving a negative result

for TTF-1 and a positive result for calretinin, Dr. Hammar stated he was ninety percent certain the tumor was mesothelioma.

On cross-examination, Dr. Hammar stated that he never reviewed Willis Whisnant's medical records, never reviewed Willis Whisnant's x-ray film or CAT scan, and that he had no contact with the treating physicians or the pathologist who reviewed the slides in 1997. Dr. Hammar acknowledged that he did not know the growth rate of the tumor. Dr. Hammar agreed that the best way to determine if a cancer is lung cancer or mesothelioma would be to evaluate tissue taken from an autopsy, that the second best way would be to evaluate tissue collected through a VATS scope, that the third best way would be to evaluate tissue collected by a Tru-cut needle biopsy, and that the fourth best way would be to evaluate tissue taken through a fine-needle biopsy. Dr. Hammar also agreed that using an electron microscope would be the best way to diagnose epithelial mesotheliomas, but he did not have an opportunity to review the slides under an electron microscope. Dr. Hammar also agreed the technique he used in this case was a last resort. Dr. Hammar admitted that he had never before diagnosed a mesothelioma with a fine-needle biopsy and only two stained slides.[4] Dr. Hammar testified that additional exposure does not contribute significantly once a single cancer cell is formed and

---

[4]He could cite to no peer-reviewed literature supporting the ability to diagnose mesothelioma with a fine-needle biopsy and two stained slides.

starts to proliferate. He agreed that working nineteen years as a pipefitter in the 1940's through the early 1960's would be sufficient exposure to allow a person to contract mesothelioma.

Dr. Friedman acknowledged that Willis Whisnant had a forty-year history of smoking and agreed that smoking can cause lung cancer all by itself. He believed the tumor was mesothelioma because the medical records indicate that Willis Whisnant complained of severe pain in the chest and back, x-rays performed in April 1996 showed an infiltrate in the left upper lobe of the lung, an x-ray performed in May 1997 found pulmonary asbestosis in addition to pleural thickening, and a CT scan showed a left posterior hemi-thorax pleural based mass with underlying rib destruction consistent with malignancy, which the reporting physician suggested might be mesothelioma or bronchogenic carcinoma. Dr. Friedman stated that it could be a lung cancer that spread to the rib, but the characteristic pain suggested to him that it was mesothelioma. Dr. Friedman also claimed that he saw a report in which the original pathologist, Dr. Moncada, stated that after seeing Dr. Hammar's special stains Dr. Moncada agreed that Willis Whisnant had mesothelioma.

According to Dr. Friedman, mesothelioma can occur with very low doses of exposure to asbestos fibers because asbestosis is found in only one-fourth of the

mesothelioma cases. And, Willis Whisnant had sufficient exposure to asbestos to cause mesothelioma because he had asbestosis and pleural plaques, which are markers for exposure to asbestos. Dr. Friedman stated the shortest possible latency period for mesothelioma is fifteen years and the average latency period is thirty to forty years. The latency period for asbestosis and pleural plaques is twenty to thirty years. Dr. Friedman did not believe the asbestos exposure at Neches Butane was significant because no significant pleural thickening was observed when Whisnant was screened in October 1986, which would have been twenty-nine years after he started at Neches Butane.

During cross-examination, Dr. Friedman initially stated that he did not have sufficient information about what Willis Whisnant did at Neches Butane to determine whether that exposure was a substantial factor in causing his disease. After being told that Willis Whisnant worked at Neches Butane from 1947 to 1966, in 1968, and from 1974 to 1977, and after being told that in answers to interrogatories Willis Whisnant stated that the duration of the exposure was continuous during each day at that premises, Dr. Friedman stated that the Neches Butane exposure would be a substantial exposure that hypothetically would be sufficient to cause mesothelioma, although in his opinion what actually occurred was additional exposure at DuPont during the latency period that led to

mesothelioma. Dr. Friedman also stated that Willis Whisnant's exposure to asbestos while working at Mobil, during and after the time he worked at DuPont, was a substantial and significant contributing factor to Willis Whisnant's mesothelioma.

REVIEW OF THE WEIGHT OF THE EVIDENCE

DuPont argues that the trial court ignored the evidence supporting the jury's verdict. Furthermore, DuPont contends that the record contains substantial evidence, which the jury was entitled to credit, directly controverting and undermining the credibility of the evidence recited in the trial court's order, that the verdict was not contrary to the overwhelming weight of the evidence, and that the trial court abused its discretion in granting the new trial. Whisnant argues the trial court did not abuse its discretion in granting the motion for new trial because the jury's verdict was contrary to the overwhelming weight of the evidence.

Whisnant contends uncontroverted witness testimony established that the working conditions at the DuPont Sabine River Works posed an unreasonable risk of harm. Gantt and Shugart claimed the pipefitters often worked in close physical proximity to insulators and carpenters who created asbestos-laden dust in their activities, but in light of the other testimony as outlined above, the jury could have concluded that they did not provide a complete or accurate depiction of the

30

working conditions Whisnant usually experienced. As described by Keuper, Derrick, and Gaskins, the jury could have believed that DuPont's dust suppression and staging efforts could have prevented or lessened the likelihood that Whisnant actually worked in dusty conditions like those Gantt and Shugart described. Dr. Corn stated that he had never seen conditions like those described by Gantt and Shugart persist anywhere and he insisted that exposures like those they described could not have occurred throughout their working lives. The jury could have believed that DuPont's witnesses provided a more complete or accurate depiction of the working conditions on DuPont's premises, or that based upon the preponderance of the evidence that Whisnant failed to establish that the working conditions at DuPont while Whisnant worked there posed an unreasonable risk of harm.

Whisnant argues the overwhelming weight and preponderance of the evidence established that DuPont had actual knowledge of the danger posed by asbestos. According to Dr. Karrh, in 1964 DuPont first became aware that people who were using asbestos in the way that asbestos would have been used in a DuPont-type of plant might be experiencing asbestos-related medical conditions. DuPont emphasizes that Whisnant had to prove that DuPont had actual knowledge of a dangerous condition that posed an unreasonable risk to Willis Whisnant, and

that Dr. Karrh testified that because pipefitters had intermittent exposure to asbestos when Willis Whisnant was working at the Sabine River Works DuPont was not aware that pipefitters were at risk. It is possible that the jury believed that DuPont was not aware that the working conditions at the plant presented an unreasonable risk of harm to Willis Whisnant. Moreover, the jury could have concluded that Whisnant failed to establish by a preponderance of the evidence that DuPont had actual knowledge of the danger asbestos fibers posed to contract employees such as Whisnant.

According to Whisnant, the evidence overwhelmingly showed that DuPont failed to exercise ordinary care to protect Willis Whisnant from danger by adequately warning him or by making the condition reasonably safe. In the safety manual that it provided to all workers, DuPont provided a general warning that a dust mask or respirator was required in an extremely dusty atmosphere, when sweeping, and for all prolonged or continuous exposure to dust. Ellenbecker expressed his opinion that DuPont's warning was too nonspecific to provide a sufficient warning, but Ellenbecker also stated that he is not an expert on the design of warnings. DuPont's witnesses described the dust-control processes which DuPont claimed would have been in effect while Willis Whisnant worked at the DuPont facility in question, and which included substitution, isolation, and

32

ventilation, i.e., all three of the forms of engineering controls for asbestos as stated by Ellenbecker. The jury could have considered the testimony of the DuPont witnesses to be credible and could have given weight to the testimony of the DuPont employees that DuPont took measures to make the premises safe for its employees and contractors by initiating dust control procedures, and the jury could have disregarded the testimony that the measures were not enforced.

The jury heard Drs. Friedman and Hammar testify that Willis Whisnant was first diagnosed with lung cancer in 1997, and that the death certificate attributed his lung cancer to smoking. However, Drs. Friedman and Hammar testified that the diagnosis of adenocarcinoma, lung cancer, was not correct. According to Drs. Friedman and Hammar, Whisnant had mesothelioma. On cross examination, Dr. Hammar agreed that:

> Q. [Your] involvement in this case begins and ends, effectively, at the request of the plaintiffs' lawyers who contacted you?
> A. That is correct.
> Q. Now, you understand that Mr. Whisnant was diagnosed with lung cancer by his treating physician back in 1997?
> A. I do.
> Q. And that was based on a review of pathology in 1997?
> A. That is correct.
> Q. And you understand that the doctor initially hired by Mr. Morgan -- I think Dr. Kronenburg was his name -- also diagnosed lung cancer?
> A. I think so, yes.
> Q. You understand that Mr. Whisnant's death certificate says his cause of death was lung cancer probably related to smoking?

A. I do understand that.

Q. And you understand that it was not until October of last year, twelve years after-- I guess roughly twelve years, eleven years, maybe -- after Mr. Whisnant was initially diagnosed, that the first even whiff of mesothelioma as the diagnosis came about; do you understand that?

A. I do.

The diagnosis of mesothelioma was first made a few months before trial. Dr. Hammar admitted that as a pathologist, without diagnostic tools, even he could not differentiate between lung cancer and mesothelioma. And further, he stated that of the four best ways to evaluate Mr. Whisnant's cancer three were not available, and that he used the fourth type of evaluation, "immunohistochemistry." Dr. Hammar also agreed that the immunohistochemistry procedure is "most reliable" when it is performed on actual blocks rather than slides. Dr. Hammar received two stained slides that were ten years old at the time he examined the slides. No blocks of tissue were available. The slides contained stained fluid and cells taken from a fine needle aspiration. Dr. Hammar testified that he had never before diagnosed mesothelioma with only two slides like this, and it was unusual for him to have to "de-stain slides before you can start your work," and he agreed it was possible that the de-staining of the slides could give a false positive or a false negative. Dr. Hammar admitted he had no scientific research, no scientific basis, to support his position, and that he had never before performed this test on previously stained

34

slides using a technique where he had to de-stain the slides. Dr. Hammar noted that he received two stained slides that were used by the previous pathologist in reaching a diagnosis of adenocarcinoma lung cancer. The jury could have chosen to discredit some or all of Dr Hammar's testimony pertaining to the diagnosis of mesothelioma which was obtained using what the jury may have believed was an untested or novel application or technique.

On the other hand, the jury could have also accepted Dr. Hammar's opinion that Willis Whisnant had mesothelioma without finding that Whisnant established by a preponderance of the evidence that DuPont was negligent or that such negligence, if any, proximately caused the injury in question. The jury heard evidence that for twenty years Willis Whisnant worked at other facilities where he was continuously exposed to asbestos. In light of Dr. Friedman's testimony that mesothelioma can occur with low doses and that asbestosis is found in only one-fourth of mesothelioma cases, the jury could have chosen to believe that the prior exposure at other facilities caused Willis Whisnant's asbestos related disease, if any. The jury could have discounted or rejected Dr. Friedman's conclusion that the lack of pleural thickening in a 1986 screening by Whisnant's legal counsel indicated the asbestos exposure at Neches Butane was insignificant. The jury also may have chosen to believe that DuPont had safety precautions in place that were

35

sufficient to prevent Willis Whisnant from being exposed to inhaled asbestos on DuPont's premises.

Whisnant bore the burden of proof by a preponderance of the evidence and the jury's "No" answer to the question of whether the negligence of DuPont proximately caused the injury reflects that the jury was not persuaded that Whisnant met that burden. The mandamus record demonstrates that the facts were hotly disputed at trial. The jury could have given more weight to the witnesses who testified that DuPont maintained effective dust-control processes than to the witnesses who claimed that the pipefitters worked in extremely dusty conditions. Similarly, the jury could have rejected the opinion testimony of Whisnant's experts and believed that the original diagnosis of lung cancer due to smoking was correct. The jury could have decided that the conditions on DuPont's premises did not result in an exposure to asbestos that caused Willis Whisnant's cancer. We conclude based upon a review of the record, given the presence of conflicting evidence, that the jury's finding of "No" in response to Question 2 and failure to find that "the negligence" of DuPont "proximately caused the injury in question," is not clearly against the great weight and preponderance of the evidence making it clearly wrong and unjust. The trial court abused its discretion by granting a new

trial for a reason that is not supported by the record. *See Toyota Motor Sales*, 407 S.W.3d at 758.

CONCLUSION

When the trial court's reasons for granting the motion for new trial are invalid, a remedy by appeal is inadequate and the relator is entitled to mandamus relief. *See id*. We conditionally grant DuPont's petition for writ of mandamus. We are confident that the trial court will vacate its order granting Whisnant's motion for new trial and enter judgment on the jury's verdict. The writ will issue only if the trial court fails to comply.

PETITION CONDITIONALLY GRANTED.


PER CURIAM


Submitted on January 22, 2015
Opinion Delivered April 23, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.