COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| W.C. LAROCK, D.C., P.C. D/B/A AUTO & WORK INJURY CLINIC AND MARIA DEL CARMEN GALLARDO/ROSEMARY SMITH, | § § § | No. 08-07-00346-CV Appeal from the |
| Appellants/Cross Appellees, | § | 327th District Court |
| v. | § | of El Paso County, Texas |
| ROSEMARY SMITH/W.C. LAROCK, D.C., P.C. D/B/A AUTO & WORK INJURY CLINIC AND MARIA DEL CARMEN GALLARDO, | § § | (TC# 2004-1648) |
| Appellee/Cross-Appellant. | § | |

**O P I N I O N**

Rosemary Smith, sued W.C. LaRock, D.C., P.C., d/b/a Auto & Work Injury Clinic (the "clinic"), and Maria Gallardo, alleging that the clinic failed to train and supervise their workers and that Gallardo, an employee of the clinic, negligently caused Smith's injuries. The City of El Paso, which paid worker's compensation benefits to Smith, later entered the suit as a plaintiff in its capacity as Smith's subrogee. The jury found Gallardo's negligence caused Smith's injury and awarded her $488,000 in damages for past and future conscious pain and mental anguish, physical impairment, medical expenses, and loss of earning capacity. The defendants moved for a judgment notwithstanding the verdict, which the trial court granted solely to reduce the medical-care award. The trial court then rendered judgment that Smith and the City recover $339,983.58 from the defendants, jointly and severally. Both parties now appeal.

**BACKGROUND**

On October 5, 2001, El Paso Police Officer Rosemary Smith injured her back while entering her patrol car. Smith sought treatment from the hospital and then her family physician, who referred her to Dr. Terry Bagley, a board certified physical medicine and rehabilitation physician. Shortly thereafter, Smith sought chiropractic care from Dr. Anuradha Prasad at the clinic.

At Smith's first visit on November 6, 2001, Dr. Prasad prescribed a course of physical therapy. However, after an MRI was performed on Smith's spine, she was referred to Dr. Luis Vasquez, a board certified neurosurgeon.

On December 21, 2001, Dr. Vasquez diagnosed Smith as suffering from a herniated disc between the L4-L5 vertebral bodies of the lumbar spine. Because a disc functions as a cushion between the vertebrae in the spine, any nucleus that herniates when an external part of the disc is cracked, causes pain or parasthesia when the nucleus contacts a nerve. Her treatment options included a surgical discectomy or physical therapy with epidural injections for pain management. Smith elected to have the surgery.

After the surgery was performed on January 29, 2002, Smith experienced relief. She left the hospital the following day and seemingly had no more pain in her back or down her leg. However, Smith did experience pain from the incision. Although she stayed with her mother following the surgery, Smith was able to do just about everything by herself.

On February 13, 2002, Smith saw Dr. Vasquez for a follow-up examination. She told the doctor that she felt good and wanted to go back to work. However, because there was still some radicular pain in her left leg, Dr. Vasquez did not release Smith for work. Dr. Vasquez told Smith to pace herself, and he prescribed physical therapy at the clinic. The doctor did not place any limitations on the specific therapies or activities Smith could perform, but rather left these matters to the therapists' discretion.

On February 20, 2002, Smith returned to the clinic for physical therapy. She did not speak with any chiropractors before the therapy commenced, nor was an evaluation and physical examination performed. Sarah Chavez performed the physical therapy, but because the incision hurt and she felt pain when asked to lie on her back, Smith was unable to complete her therapy and was told to see Dr. Superville. Smith then spoke with Dr. Superville, who asked how she was doing, but did not examine or evaluate her. Rather, when Smith told him that she recently underwent surgery, Dr. Superville replied, "Well, then, we don't need to do anything right now."

Smith went back to the clinic for physical therapy on February 22, 2002. Feeling well enough, Smith drove herself to the clinic. At the clinic, Chavez started Smith's therapy by gently lifting her right leg about an inch to an inch-and-a-half off the ground. Soon, the session was interrupted by a phone call for Chavez. As Chavez took the call, Maria Gallardo took her place. Gallardo looked at Smith's chart and then took Smith's right leg, placed one hand under her knee and the other at her ankle, and performed a knee-to-chest stretching exercise. Smith, not expecting her leg to be raised so far, felt pain in the area near her surgical incision and down her legs. Because the exercise was performed so quickly, Smith did not have the opportunity to tell Gallardo about the pain, and Gallardo only stopped because Smith jerked back and her leg went forward. Smith began to cry from the pain, which was worse than she felt after her injury on October 5, 2001.

Smith could barely walk, and Gallardo, with help from another therapist, assisted Smith to another room for massage therapy. Although the massage helped a little bit, Smith was told to wait for Dr. Superville. As she waited, Smith was in so much pain that she felt very nauseous and vomited in the bathroom, and after fifteen minutes, she called for a ride and left before seeing the doctor. When Smith returned to her mother's house that afternoon, the pain to her back and leg worsened.

On February 25, 2002, Smith saw Dr. Prasad. Dr. Prasad was surprised to see Smith limping because nothing in her chart indicated anything had happened. Smith told the doctor what occurred three days before and that she did not want Gallardo touching her. Believing the pain would go away with more therapy, Smith stayed at the clinic. However, the stretching was too painful and so was Dr. Prasad's adjustments on Smith's back. Because Smith could no longer do the stretches or the adjustments, she started aquatic therapy.

On March 13, 2002, Smith, having significant muscle spasms in the lower back and sharp shooting, stabbing pain down her leg, returned to Dr. Vasquez. When Dr. Vasquez saw Smith on April 5, 2002, she was limping. Because Smith's condition persisted, Dr. Vasquez ordered another MRI, and on April 11, 2002, the MRI revealed a recurrent herniated disc at L4-L5, the same place Smith was operated on before.

On April 16, 2002, Smith underwent a second surgical procedure to repair the herniation. That procedure revealed the presence of a large fragment of the disc in the same area as her previous surgery, which the doctor removed. Although she received some relief following the surgery, Smith continued to experience pain that radiated to her legs. Smith did not experience significant relief as she had with the first surgery.

Following the second surgery, Smith underwent physical therapy again, but this time, she sought therapy at El Paso Physical Therapy. There, the same knee-to-chest stretch that Gallardo performed was conducted; however, this time, an explanation of the exercise was explained to Smith first and the same was performed very slowly with minimal pressure. The physical therapy alleviated some of Smith's pain, but she continued to experience pain and loss of flexibility.

Smith returned to light duty work in January 2003, as a court liaison. While working as a court liaison for approximately one year, Smith felt better since she was not required to wear all of

her equipment, but she was sill having back pain and numbness in her leg. Light duty was soon eliminated by the police department, and Smith was required to dress in full uniform and don a revolver, handcuffs, and other equipment that weighed approximately 25 pounds. Wearing so much equipment was painful and Smith's condition fluctuated among the days.

Smith continued to see Dr. Vasquez, telling him that she still felt pain and that she believed something was wrong. On June 4, 2003, Smith developed a burning and pulling sensation in her back while running on a treadmill. A third MRI conducted in October 2003, revealed another herniation at L4-L5. Dr. Vasquez told Smith that she needed another surgery to fuse her back.

On March 22, 2004, a third surgery was performed. That surgery went better than the second surgery, and although Smith no longer had much pain, she still did not feel well, and the third surgery did not relieve as much pain as the first surgery did. Shortly, thereafter, Smith returned to work at a desk job.

Following her return to work, Smith was involved in several incidents noted by her worker's compensation, which the City included as subsequent injuries under Smith's original injuries sustained on October 5, 2001. The first occurred on January 19, 2005, when she tripped over a large rock. Smith received medical treatment following the incident. The second incident occurred on March 15, 2005, when Smith caught a suspect after a brief pursuit on foot. Smith did not feel that she injured herself during the event, nor did she go to the doctor. However, on July 15, 2005, Smith was reinjured when she was thrown to the ground by a drunken prisoner. Smith saw an orthopedist for her knee, but she also experienced a back spasm. Finally, Smith experienced back pain when she changed a tire in July 2007.

Smith later sued the clinic and Gallardo, alleging negligence in failure to train and supervise their workers and that Gallardo was the cause of her injuries and medical expenses. The contested

issue at trial, as now on appeal, was causation.

At trial, Dr. Prasad testified that she and Drs. Superville and LaRock were responsible for supervising the therapists, including Gallardo, and that Gallardo began working at the clinic in January 2000. Gallardo testified that she had no experience as a therapist before she worked at the clinic, that she was only trained for three to five days by other therapists at the clinic, and that she did not speak with any of the chiropractors before commencing Smith's therapy. Dr. Prasad noted that the therapy Smith underwent on February 20 and 22 was Smith's first postoperative therapy. Therapy for postoperative patients, according to Dr. Prasad, aids in mobilization and flexibility in the joints and muscles. However, Dr. Prasad cautioned that the patient should not be over-stretched or exercised. Nevertheless, Dr. Prasad did not believe that the therapy Gallardo administered to Smith injured her disc because the exercise was performed with Gallardo's assistance and no load or torque was placed on the spine that would cause a disc problem.

However, Stephen Campbell, a licensed physical therapist, testified that the knee-to-chest exercise performed on Smith could have caused torque to Smith's lower back and was not within the acceptable standard of care. According to Campbell, physical therapy, if not properly administered, can injure a patient. Campbell testified that evaluation of a back-surgery patient is necessary before any therapy and that if the therapist does not evaluate a patient before initiating treatment, there is a chance that the therapy could re-herniate the disc of a patient who underwent surgery. He did not believe Gallardo had adequate training to perform the procedure she did on Smith, and that the postoperative physical therapy provided to Smith at the clinic was inadequate. Similarly, David Sime, a licensed chiropractor, testified that if the knee-to-chest exercise is over-aggressively performed, then that exercise could injure the patient.

However, Dr. Jacob Heydemann, a board-certified orthopedic surgeon, testified that the

exercise administered by Gallardo may not have caused the reherniation. Smith's back pain two weeks after surgery, according to Dr. Heydemann, did not necessarily correlate to a herniation of the disc and could have been caused by a lot of things. He believed the reherniation was more of a coincidence. Dr. Heydemann recited that there is a 10 to 15 percent risk of recurrent disc herniation and fragment formation after disc surgery even if the surgery was performed competently. The doctor believed that a disc can reherniate from a simple movement such as getting out of bed or off the toilet.

Dr. Vasquez testified that Smith did well after the first surgery and did not experience any significant pain until after Gallardo administered the knee-to-chest exercise. It was possible, according to Dr. Vasquez, that the therapy Gallardo performed caused the recurrent herniation of the disc. Although the doctor agreed that the knee-to-chest exercise would not have placed any load or torque on Smith's spine nor caused any anatomic damage to the disc, if Smith were lying flat at the time it was performed, Dr. Vasquez opined, after seeing the maneuver performed on a doll, that the flexing of the leg with the knee being pushed up towards the chest can, within a reasonable medical probability, cause a reoccurrence or a reherniation of a disc that was surgically repaired a month before. However, Dr. Vasquez also testified that reoccurrence of the herniation could have other causes. For instance, the disc could have simply refragmented, causing the reoccurrence of the herniation, or the reherniation could have resulted from the inability to remove all of the fragments of the disc during surgery.

Dr. Vasquez refused to testify that the therapy had any causal relation to the need for the fusion that was performed in the third surgery. According to Dr. Vasquez, he believed the fusion was necessary because the herniation returned following the two surgeries, which indicated an abnormal motion at that segment in the spine.

**DISCUSSION**

The clinic and Gallardo raise three issues on appeal. The first is whether the evidence was legally and factually sufficient to establish that Gallardo's alleged negligence was the proximate cause of Smith's reherniation, the second is whether the evidence was legally and factually sufficient to support the jury's findings of past medical expenses when Smith failed to segregate the same, and the third is whether the trial court erred by admitting medical affidavits of various healthcare providers' gross charges. In addition to refuting the clinic's and Gallardo's allegations, Smith raises a cross-point on appeal, that is, whether the trial court erred by reducing the medical-care award. Finding the evidence legally insufficient on proximate cause, we need not address the parties' remaining contentions.

*Standard of Review*

In reviewing the legal-sufficiency of the evidence, we only consider the evidence and inferences that tend to support the finding of the disputed fact, unless a reasonable juror could not give credit to such evidence or inferences. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Linan v. Rosales*, 155 S.W.3d 298, 302 (Tex. App.–El Paso 2004, pet. denied). We further disregard all evidence and inferences to the contrary unless a reasonable juror could not disregard such evidence and inferences. *Wilson,* 168 S.W.3d at 827; *Havner*, 953 S.W.2d at 711; *Linan*, 155 S.W.3d at 302. However, we do not weigh the evidence or make our own credibility determinations as that role belonged to the fact finder. *Wilson*, 168 S.W.3d at 827; *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

If there is more than a scintilla of evidence of probative force to support the finding, the

evidence is legally sufficient. *Sherman v. First Nat'l Bank in Center, Texas*, 760 S.W.2d 240, 242 (Tex. 1988); *Linan*, 155 S.W.3d at 302. However, when the evidence of a vital fact is "so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

*Pertinent Law*

In a medical-negligence case, the plaintiff must prove by a preponderance of the evidence that, within a reasonable medical probability, the allegedly negligent act or omission proximately caused the harm alleged. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993). The four elements to prove include: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) injury or harm to the plaintiff; and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *Morrell v. Finke*, 184 S.W.3d 257, 271 (Tex. App.–Fort Worth 2005, pet. denied); *Linan*, 155 S.W.3d at 302; *Krishnan v. Ramirez*, 42 S.W.3d 205, 212 (Tex. App.–Corpus Christi 2001, pet. denied). Here, we are concerned with cause.

To establish proximate cause, the plaintiff must prove cause-in-fact and foreseeability. *Columbia Medical Center of Las Colinas v. Hogue,* 271 S.W.3d 238, 246 (Tex. 2008); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *Arlington Mem'l Hosp. Found., Inc. v. Baird*, 991 S.W.2d 918, 922 (Tex. App.–Fort Worth 1999, pet. denied). Cause in fact is not established "where the defendant's negligence does no more than furnish a condition which makes the injuries possible." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2003). Cause in fact is established "when the act or omission was a substantial factor in bringing

about the injuries, and without it, the harm would not have occurred." *Id*. The ultimate standard on causation is whether the plaintiff proved, by a preponderance of the evidence, that "the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Kramer*, 858 S.W.2d at 400; *see also Hogue*, 271 S.W.3d at 246; *Linan*, 155 S.W.3d at 303; *Park Place Hosp.*, 909 S.W.2d at 511. The plaintiff satisfies the cause-in-fact element of proximate cause by presenting proof establishing a direct causal connection between the damages awarded, the defendant's negligence, and the injury suffered. *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997); *Morrell*, 184 S.W.3d at 272.

*Application*

In addressing the legal sufficiency of the evidence to support causation, Smith contends that Dr. Vasquez's testimony alone was sufficient to establish causation. We disagree.

Generally, expert testimony is required to prove negligence in medical-negligence cases unless the form or mode of treatment is a matter of common knowledge or the matter is within the experience of a layperson. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007); *Hood v. Phillips*, 554 S.W.2d 160, 165-66 (Tex. 1977); *Linan*, 155 S.W.3d at 302-03; *Baird*, 991 S.W.2d at 921-22. And in particular, expert testimony is necessary on the issues of medical negligence and causation. *Linan*, 155 S.W.3d at 303; *Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 874 (Tex. App.–Beaumont 2007, pet. denied); *Baird*, 991 S.W.2d at 922. Therefore, a plaintiff's expert must establish a causal connection between her injury and the negligence of the defendant based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *See, e.g., Hogue,* 271 S.W.3d at 247; *Park Place Hosp.*, 909 S.W.2d at 511; *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995); *Kramer,* 858 S.W.2d at 400; *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988). "Reasonable medical probability" means the injury was "more likely than not" a result

of the negligent action. *Thomas v. Farris*, 175 S.W.3d 896, 899 (Tex. App.–Texarkana 2005, pet.

denied); *Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.–Houston [14th Dist.] 1994, writ

denied). To prove reasonable medical probability, reasonable inferences are permissible, and a

plaintiff is not required to exclude every other reasonable hypothesis. *Bradley*, 879 S.W.2d at 954;

*Thomas*, 175 S.W.3d at 899.

Reasonable medical probability does not turn on semantics or on the use by the expert

witness of any particular term or phrase. *Thomas*, 175 S.W.3d at 900 (citing *Ins. Co. of N. America

v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966)). Indeed, an expert need not use the magic words

"reasonable medical probability" if the evidence establishes that was the substance of his opinion.

*Hogue,* 271 S.W.3d at 247; *Stodghill v. Tex. Employers Ins. Ass'n*, 582 S.W.2d 102, 105 (Tex.

1979). Similarly, although an expert may use the phrase "reasonable probability," his testimony may

still be insufficient to establish the same when the substance of his testimony raised only mere

possibilities, speculation, and surmise. *Schaefer v. Tex. Employers' Ins. Assn.*, 612 S.W.2d 199, 204

(Tex. 1980) (finding expert testimony no evidence of causation even though witness testified using

the phrase "reasonable probability"). Simply, while expert medical testimony concerning the

possible causes of the condition in question is admissible to assist the trier of fact in evaluating other

evidence in the case, a possible cause only becomes probable when, in the absence of other

reasonable causal explanations, it becomes more likely than not that the injury was a result of its

action. *Bradley*, 879 S.W.2d at 954; *Thomas*, 175 S.W.3d at 899.

In this case, Dr. Vasquez's pertinent testimony is set out as follows:

[Counsel]:     Doctor, on the physical therapy that was performed on Rosemary
Smith, she has described it as laying on her back, and then having the
therapist lift up her knee in a bent position – her leg, I'm sorry, in a
bent position, and then the therapist forced the leg up, with the leg
bent, with the knee coming towards her chest, and upon that

occurring, Rosemary Smith felt pain and shooting pain down the left leg. Would that type of mechanism so shortly after the first surgery, within a reasonable medical probability, cause the recurrent disk herniation that you found in the second surgery.

[Vasquez]:    *It is possible.*

[Counsel]:    Within a reasonable medical probability, is it your opinion that that's what caused the second herniation?

[Vasquez]:    Well, I have to tell you that I take the patient's version, okay? That's the version that was offered to me by the patient. And, I mean, when I take a history, I trust what the patient tells me, you know, I have no other way of knowing really, what exactly happened.

[Counsel]:    Yes, sir. And based upon what the patient told you, would you say that the manipulation that was performed on the physical therapy was the cause of that herniation?

[Vasquez]:    *It's possible.*

.   .   .

[Counsel]:    [Plaintiff's counsel] has also indicated that you have been potentially designated as an expert witness to offer some opinions in this case, potentially to link the need for the surgery in April of '02 to therapy that was performed by Carmen Gallardo on or about February 22, 2002. And as I understand your testimony, *that is only a possibility* as the explanation for the need –

[Vasquez]:    Yes.

.   .   .

[Counsel]:    [When a maneuver is] done suddenly, quickly, without being able to allow the patient to indicate whether there is pain or not, that's even a worse situation, isn't it?

[Vasquez]:    *It's possible.*

.   .   .

[Counsel]:    Now, you saw the maneuver that was being performed on the doll that Mr. Tatem put on the table?

[Vasquez]:     Right.

[Counsel]:     And he was correct.  Rosemary Smith has indicated, as has Carmen Gallardo, as to the type of maneuver that was being performed on Rosemary Smith for the physical therapy, and that would be the flexing of the leg with the knee being pushed up towards the chest area, and that was done quickly, and that had never been done to Rosemary Smith prior to Carmen Gallardo doing that.  Now, based on your observation and the testimony that has been elicited by both Rosemary – from Rosemary Smith and from Carmen Gallardo, that type of action on a recently operated lower back, within a reasonable medical probability, *can that cause* a reoccurrence or a reherniation of a disk that had just been surgically repaired less than a month earlier?

[Vasquez]:     That's right.  (Emphasis added).

"Perhaps," "possibly," "can," and "could" indicate mere conjecture, speculation or possibility rather than qualified opinions based on reasonable medical probability.  *See Hogue,* 271 S.W.3d at 247 (stating that "perhaps" and "possibly" do not indicate reasonable medical probability); *Havner*, 953 S.W.2d at 729-30 (stating that "can" and "could" do not indicate reasonable medical probability).  Here, Dr. Vasquez's testimony did not indicate a reasonable medical probability that Gallardo's therapy caused Smith's reherniation; rather, he simply testified that it was possible or could cause the reherniation.  *See Western Cas. & Sur. Co. v. Gonzales*, 518 S.W.2d 524, 526-27 (Tex. 1975) (expert's testimony must do more than simply acknowledge that everything is possible).

Moreover, the substance of Dr. Vasquez's testimony fell short of showing causation.  Indeed, Dr. Vasquez testified that reoccurrence of the herniation could have other causes.  He stated that it was possible that the reherniation could have resulted from his inability to remove all of the fragments of the disc during surgery.  Although Dr. Vasquez believed he removed all such fragments during the first surgical procedure, his belief was limited solely to the fragments that he could see.  Additionally, Dr. Vasquez acknowledged that the disc could have simply refragmented, causing the

reoccurrence of the herniation. Dr. Vasquez also testified that the surgery may not have improved the patient's condition. Finally, Dr. Vasquez noted that Smith performed non-prescribed and unsupervised exercise on a treadmill, and he refused to testify that the physical therapy at the clinic had any causal relation to the need for the fusion that was performed in the third surgery. Rather, he believed the fusion was necessary because the herniation returned following the two surgeries, which simply indicated an abnormal motion at that segment in the spine.

In short, we do not find this testimony to constitute evidence of a causal connection between the acts of Gallardo and the reherniation of Smith. Dr. Vasquez's testimony, at most, established that the reherniation was possibly caused by Gallardo's therapy. This is no evidence of reasonable medical probability of a causal connection between Gallardo's acts and Smith's reherniation. *See Hogue,* 271 S.W.3d at 247; *Schaefer*, 612 S.W.2d at 204; *Thomas*, 175 S.W.3d at 901.

Nevertheless, expert testimony on causation is not required in limited circumstances when "both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Guevara*, 247 S.W.3d at 668. However, this is not a case where an otherwise healthy individual suffers a broken bone following an automobile accident or inhales toxic fumes from a typesetting machine. *See, e.g., id.* (recognizing that "causation as to certain types of pain, bone fractures, and similar basic conditions following an automobile collision can be within the common experience of lay jurors"); *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (finding lay testimony sufficient on whether chemical fumes from a typesetting machine caused plaintiff's medical symptoms). At most, Smith's testimony that she felt pain when Gallardo performed the knee-to-chest exercise merely raised suspicion that the event caused the reherniation. *Guevara*, 247 S.W.3d at 668 (evidence of an event followed closely by manifestation of or treatment

for conditions which did not appear before the event raises suspicion that the event at issue caused the condition). But as the Supreme Court has noted, suspicion is not legally sufficient to support a finding of causation. *Guevara*, 247 S.W.3d at 668.

Here, Smith was suffering from a pre-existing condition. Additionally, the testimony established that the timing of the onset of pain that Smith experienced did not mean that the disc herniated at the moment Gallardo administered the knee-to-chest exercise; rather, the only inference that could be drawn was that the disc contacted the nerve at that point in time. The disc itself may well have herniated before then. As Dr. Vasquez acknowledged, the therapy Gallardo administered was only a possible cause of Smith's reherniation. Under these circumstances, we cannot conclude that expert testimony was not required to establish causation. *See id.* at 669 (lay testimony legally insufficient to show causation between car accident and majority of hospitalization expenses when plaintiff had pre-existing conditions); *Myers*, 411 S.W.2d at 713 (holding that an "inference that a pre-existing tumor was activated and the deadly effects of a malignancy accelerated by an injury" was a "question of science determinable only from the testimony of expert medical professionals").

Finding Dr. Vasquez's testimony incompetent and therefore no evidence on causation, and that the lay testimony alone was insufficient to support proximate causation, we hold the evidence legally insufficient and sustain the clinic's and Gallardo's first issue.

## CONCLUSION

Having sustained the clinic's and Gallardo's first issue, we need not address their remaining contentions concerning the segregation of medical expenses or the admissibility of the medical-expense affidavits, or Smith's cross-appeal complaining of the trial court's reduction of the medical bills. Accordingly, we reverse the judgment of the trial court and render judgment that Smith take nothing. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992) ("when we sustain

a no evidence point of error after a trial on the merits, we render judgment on that point").


GUADALUPE RIVERA, Justice

February 24, 2010

Before McClure, J., Rivera, J., and Guaderrama, Judge
Guaderrama, Judge, sitting by assignment