Opinion by: Irene Rios, Justice
PETITION FOR WRIT OF MANDAMUS DENIED
On September 28, 2017, relator filed a petition for writ of mandamus and a motion for temporary relief. The real parties filed a response, to which relator later replied. After considering the petition, response, and reply, this court concludes relator is not entitled to the relief sought. Accordingly, the petition for writ of mandamus is DENIED. See TEX. R. APP. P. 52.8(a).
Dissenting Opinion by: Marialyn Barnard, Justice
DISSENTING OPINION
Marialyn Barnard, Justice
At issue in this mandamus proceeding is whether the trial court abused its discretion in disregarding a jury verdict in favor of relator Dr. Andrew W. McAdoo and granting a new trial in favor of real parties in interest, O.J.H. and K.L.H., Individually and as Next Friend of J.P.H. (collectively "the parents"). After the jury returned its verdict, finding "no" in response to the broad form negligence question, the trial court granted a motion for new trial stating the jury's refusal to find negligence as to Dr. McAdoo was "so contrary to the overwhelming weight and preponderance of the evidence adduced at trial to be manifestly unjust." However, after conducting a merits-based mandamus review of the trial court's articulated reasons for granting the new trial, I do not believe the record supports the trial court's rationale for granting the new trial. In other words, I believe the record contains sufficient evidence to support the jury's verdict. Accordingly, I would grant Dr. McAdoo's petition for writ of mandamus and order the trial court to (1) vacate its order granting the motion for new trial, and (2) reinstate the judgment based on the jury's verdict. I therefore respectfully dissent to the majority's denial of the petition for writ of mandamus.
*590 BACKGROUND
The parents took their ten-year-old daughter, J.P.H., to the emergency room of Doctors Hospital in Laredo, Texas. The child was complaining of severe abdominal pain. Following a CT scan, the on-call radiologist, Dr. McAdoo, provided the emergency room doctor with his differential diagnosis[2] :
pyosalpinx suggested on right[;] left ovarian cyst? Tubovarian abscess on left 4.2 x 2.7 cm[;] small amount of free fluid[,] right pelvis and stranding on left[;] appendix upper limits but appendicitis not favored
The emergency room doctor, based on his physical examination of J.P.H., her lab results, and Dr. McAdoo's report, began treating J.P.H. with antibiotics for a potential infection. At approximately 11:00 p.m., the emergency room doctor consulted with J.P.H.'s on-call pediatrician, who recommended that she be transferred to a hospital in San Antonio for higher level pediatric care given that Doctors Hospital had neither a pediatric surgeon nor pediatric gynecologist on staff. J.P.H.'s parents asked that J.P.H. be transferred to Methodist Children's Hospital in San Antonio. According to the record, Doctors Hospital began transfer procedures at approximately 1:00 a.m.
Shortly after Methodist Children's Hospital received the memorandum of transfer, it contacted Doctors Hospital, advising that before the transfer could take place, Doctors Hospital would have to file a police report because of Dr. McAdoo's pyosalpinx diagnosis. The record shows pyosalpinx can be indicative of sexual abuse; however, evidence at trial showed pyosalpinx may also be caused by infections other than sexually transmitted diseases, including ascending infections from other organs. To comply with Methodist Children's Hospital's request, Doctors Hospital contacted the Laredo Police Department at approximately 1:58 a.m. Officers from the department arrived shortly thereafter and took an "information-only" incident report.
J.P.H. left Doctors Hospital by ambulance at approximately 4:00 a.m., arriving at the emergency room of Methodist Children's Hospital just before 6:00 a.m. When she arrived, a Methodist Children's Hospital radiologist reviewed the prior CT scan and reported (1) elongation of the child's right fallopian tube, (2) free fluid in the child's pelvis, and (3) a caustic mass on the child's left pelvis superior to the uterus. The radiologist recommended an ultrasound of J.P.H.'s pelvis "with doppler." More than four hours later, the ultrasound was performed. At approximately 11:40 a.m., the results of the ultrasound were discussed with the Methodist Children's Hospital physician who was treating J.P.H. Although the ultrasound showed no abnormalities with regard to the child's uterus or right ovary, it revealed an abnormality with regard to the child's left ovary. The final report included the following "impression":
When correlating to the findings on the outside comparison CT scan, the ultrasound findings are also worrisome for left tubo-ovarian abscess. A hydrosalpinx or pyosalpinx is present as well with the dilated tubes identified in the right adnexal region.
*591 (emphasis added). Thus, the ultrasound report also included a diagnosis that an infection was present-including a possible pyosalpinx infection as diagnosed by Dr. McAdoo. Because doctors at Methodist Children's Hospital could not conclusively determine J.P.H.'s condition, they recommended laparoscopic surgery. After the parents consented, surgery was performed at approximately 4:30 p.m., more than ten hours after J.P.H. arrived at Methodist Children's Hospital. During the surgery, the surgeon removed a portion of J.P.H.'s left fallopian tube because it was necrotic.
According to the post-operative pathology report, J.P.H. suffered from a "left torsed fallopian tube" "showing diffuse hemorrhagic necrosis." The report further stated the necrosis was consistent with an "acute infarction associated with adnexal torsion." Dr. Parke Hedges, an expert for Dr. McAdoo, explained the fallopian tube had been torsed, i.e., twisted, by an ovarian cyst that became enlarged, moving the fallopian tube into an abnormal position. Dr. Hedges opined the torsion caused a "very recent death of the tissue" in the left fallopian tube, probably sometime between the ultrasound and surgery.
Subsequent to the surgery and the loss of a portion of their child's left fallopian tube, the parents brought suit against Doctors Hospital and Dr. McAdoo alleging negligence. As to Dr. McAdoo, the parents claimed his misdiagnosis of pyosalpinx, which can be caused by a sexually transmitted disease, delayed the transport of J.P.H. to Methodist Children's Hospital in San Antonio. The parents alleged his misdiagnosis distracted personnel at Methodist Children's Hospital, leading them to believe the child had been sexually abused, which prompted hospital personnel to require a police report prior to transport. The parents alleged that if Dr. McAdoo had included in his preliminary report a diagnosis of hydrosalpinx, which is not associated with sexually transmitted diseases, as other experts subsequently did, transport would not have been delayed. According to the parents, but for the delay, J.P.H.'s fallopian tube would not have become necrotic and she would not face future infertility issues.
After the parents settled with Doctors Hospital, the matter proceeded to a jury trial with Dr. McAdoo as the sole defendant. The trial took five days and included testimony from eleven witnesses and the introduction into evidence of hundreds of pages of documents. At the conclusion of the trial, the jury was asked whether "the negligence, if any, of Andrew McAdoo, D.O., proximately cause[d] the injury" to J.P.H. The jury unanimously answered "No." The trial court rendered a take nothing judgment in favor of Dr. McAdoo based on the jury's verdict. Thereafter, the parents filed a motion for new trial in which they claimed, among other things, that the jury's verdict was against the great weight and preponderance of the evidence. According to the parents, the overwhelming weight of the evidence established Dr. McAdoo's negligence proximately caused injury and damage to J.P.H. The trial court agreed and rendered an order granting the parents' motion for new trial.
In its order, the trial court stated that although it did not take lightly its authority to set aside a jury verdict, it also understood "its obligation and responsibility to correct what is clearly wrong and unjust." The trial court then stated that based on its observations and recollection of the evidence, the jury's refusal to find Dr. McAdoo negligent was contrary to the overwhelming weight and preponderance of the evidence. The trial court went on to set out some of its observations with regard to the evidence.
*592 After the trial court granted the parents' motion for new trial, Dr. McAdoo filed his petition for writ of mandamus in this court. On April 18, 2018, the majority issued its denial of Dr. McAdoo's petition. As stated above, because the record includes evidence sufficient for the jury to have reached a finding that Dr. McAdoo was not negligent, I must dissent.
ANALYSIS
In this proceeding, we were asked to determine whether the trial court erred in granting the parents' motion for new trial. This requires the court to review the trial court's order and determine whether: (1) the order states a legally appropriate reason for the new trial; (2) the stated reason is sufficiently specific enough to show the trial court did not simply parrot a pro forma template, but derived its articulated reason from the particular facts and circumstances of the case; and (3) the record supports the trial court's rationale for ordering the new trial. In re Bent , 487 S.W.3d 170, 173 (Tex. 2016) (orig. proceeding); see In re Toyota Motor Sales, U.S.A., Inc. , 407 S.W.3d 746, 758 (Tex. 2013) (orig. proceeding); In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P. , 290 S.W.3d 204, 210, 213 (Tex. 2009) (orig. proceeding).
I agree that the trial court's order states a legally appropriate reason for the new trial-the evidence is factually insufficient to support the jury's verdict. See Bent , 487 S.W.3d at 173 ; Columbia Med. Ctr. , 290 S.W.3d at 213. I also agree the order is sufficiently specific to show the trial court derived its insufficiency finding from the particular facts and circumstances of the case. See Bent , 487 S.W.3d at 173 ; Columbia Med. Ctr. , 290 S.W.3d at 213. I therefore agree the trial court's order is facially sufficient. See Bent , 487 S.W.3d at 173 ; Columbia Med. Ctr. , 290 S.W.3d at 213. Accordingly, the only issue is whether the record supports the trial court's determination that the evidence is insufficient to support the jury's verdict. See Toyota Motor Sales , 407 S.W.3d at 758. Because I believe the record is replete with evidence supporting the jury's take-nothing verdict, I must dissent to the majority's denial of Dr. McAdoo's petition for writ of mandamus.
Standard of Review-Mandamus
To be entitled to mandamus relief, a relator must show: (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. In re Reece , 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. In re Cerberus Capital Mgmt. L.P. , 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding). "In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." In re Sanders , 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding). In other words, we must defer to the trial court's factual determinations if they are supported by the evidence, but we review de novo the trial court's legal determinations. In re Labatt Food Serv., L.P. , 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding).
A trial court's order granting a new trial is subject to review in a mandamus proceeding. See Toyota Motor Sales , 407 S.W.3d at 755-59 ; In re United Scaffolding, Inc. , 377 S.W.3d 685, 688-89 (Tex. 2012) (orig. proceeding). If a trial court's articulated reasons for granting the new *593 trial are not supported by the underlying record, the new trial order cannot stand even if it conforms with the procedural requirements set out by the supreme court. Toyota Motor Sales , 407 S.W.3d at 755. To make this determination, we conduct a careful "merits review" of the record. Id. ("Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough; the reasons must be valid and correct."). Here, we were required to decide whether the trial court's determination-that the jury's unanimous answer of "no" to the broad-form negligence question was against the great weight and preponderance of the evidence-is supported by the underlying record. See ids="7091923" index="18" url="https://cite.case.law/sw3d/407/746/#p758">id. To make this determination, we must analyze this issue under the factual-sufficiency standard of review. See, e.g., In re Ybarra , No. 04-17-00245-CV, 2017 WL 4655347, at *3 (Tex. App.-San Antonio Oct. 18, 2017, orig. proceeding) ; In re Athans , 478 S.W.3d 128, 133-34 (Tex. App.-Houston [14th Dist.] 2015, orig. proceeding) (op. on reh'g); In re E.I. duPont de Nemours & Co. , 463 S.W.3d 80, 85 (Tex. App.-Beaumont 2015, orig. proceeding) (per curiam); In re Wyatt Field Serv. Co. , 454 S.W.3d 145, 152-53 (Tex. App.-Houston [14th Dist.] 2014, orig. proceeding [mand. dism'd] ) ; In re Zimmer, Inc. , 451 S.W.3d 893, 905-06 (Tex. App.-Dallas 2014, orig. proceeding) ; In re Baker , 420 S.W.3d 397, 402-03 (Tex. App.-Texarkana 2014, orig. proceeding). If the record does not support the trial court's determination that the evidence was against the great weight and preponderance of the evidence-its stated reason for granting the new trial, then the trial court abused its discretion by granting a new trial based on factual sufficiency. See Wyatt Field Serv. Co. , 454 S.W.3d at 152-53.
Standard of Review-Factual Sufficiency
I recognize that in reviewing an order granting a new trial, I must remain mindful of the different roles of the jury, the trial court, and the appellate court. As stated by the Fourteenth Court of Appeals:
In a mandamus proceeding, we may not substitute our judgment for that of the trial court. But neither may the trial court substitute its judgment for that of the jury in granting a new trial. The method for ensuring that the trial court does not substitute its judgment for that of the jury, is [for the appellate court] to confirm that the court's reasons for granting a new trial are valid and correct, i.e., supported by the trial record.
Id. (citations omitted) (emphasis added).
When, as here, a party attacks the factual sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate the adverse finding is against the great weight and preponderance of the evidence. See Dow Chem. Co. v. Francis , 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); Wyatt Field Serv. , 454 S.W.3d at 151 ; E.I. duPont de Nemours & Co. , 463 S.W.3d at 85. As reviewing courts, both the trial court and the appellate court must consider and weigh all the evidence and set aside the jury finding only if the finding is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. See Dow Chem. Co. , 46 S.W.3d at 242 ; Wyatt Field Serv. , 454 S.W.3d at 151 ; E.I. duPont de Nemours & Co. , 463 S.W.3d at 85. A jury's failure to find a fact cannot be taken away simply because the trial court concludes the evidence preponderates toward an affirmative answer. E.I. duPont de Nemours & Co. , 463 S.W.3d at 85. Moreover, a jury's answer of "no" does not have to be supported by a preponderance *594 of the evidence of even affirmative evidence-to require this would improperly shift the burden of proof. Id. Finally, we must keep in mind that the amount of evidence required to show factually sufficient evidence supports a jury finding is far less than the amount of evidence necessary to justify a conclusion that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet , 61 S.W.3d 599, 615-16 (Tex. App.-Houston [14th Dist.] 2001, pet. denied).
When reviewing a jury's verdict, the reviewing court must keep in mind that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. City of Keller v. Wilson , 168 S.W.3d 802, 819 (Tex. 2005) ; Golden Eagle Archery, Inc. v. Jackson , 116 S.W.3d 757, 761 (Tex. 2003). When a jury is presented with conflicting testimony, it may believe one witness-in whole or in part, disbelieve others, and it may resolve inconsistencies in the testimony of any witness. Athans , 478 S.W.3d at 134 (citing McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986) ); E.I. duPont de Nemours & Co. , 463 S.W.3d at 85. As previously stated by this court in Ybarra , "[a]n appellate court may not substitute its judgment for that of the trial court; however, 'neither may the trial court substitute its judgment for that of the jury in granting a new trial.' " 2017 WL 4655347, at *3 (quoting Wyatt Field Serv. , 454 S.W.3d at 152 ).
The Evidence
To prevail in a medical malpractice action based on negligence, a plaintiff must establish the existence of a legal duty, a breach of the duty, and damages proximately caused by the breach. Bustamante v. Ponte , 529 S.W.3d 447, 456 (Tex. 2017). The two elements of proximate cause are cause in fact and foreseeability. Id. A plaintiff establishes cause in fact when it proves the alleged act or omission was a substantial factor in bringing about the injuries, and without it, the injuries would not have occurred. Id. In other words, the issue with regard to causation is " 'whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred.' " Park Place Hosp. v. Estate of Milo , 909 S.W.2d 508, 511 (Tex. 1995) (quoting Kramer v. Lewisville Mem'l Hosp. , 858 S.W.2d 397, 400 (Tex. 1993) ). Evidence that a defendant's alleged negligence did no more than furnish a condition that made the alleged injuries possible is insufficient to establish cause in fact. IHS Cedars Treatment Ctr. v. Mason , 143 S.W.3d 794, 799 (Tex. 2004).
In their motion for new trial, the parents alleged the overwhelming weight of the evidence established Dr. McAdoo was negligent in that he misdiagnosed J.P.H. "with a condition never before reported in medical history for a child, and refusing to include any differential diagnosis which would have allowed [J.P.H.] to receive the emergency surgery she needed." They claimed the undisputed evidence "unequivocally" supported a finding that Dr. McAdoo misdiagnosed J.P.H. with pyosalpinx, which delayed the transport of J.P.H. to Methodist Children's Hospital, resulting in the loss of her fallopian tube. The parents claimed only Dr. McAdoo's self-serving, and self-contradicted testimony supported the jury's finding.
In its order granting the motion for new trial, the trial court stated that having taken judicial notice of the record, and based "on the Court's own observations and recollection of the evidence presented, finds good cause to grant the motion for new trial and to set aside the jury verdict *595 and judgment on the grounds of the jury's findings, in refusing to find negligence as to Defendant Dr. Andrew McAdoo, being so contrary to the overwhelming weight and preponderance of the evidence adduced at trial to be manifestly unjust." The trial court then set out some of the evidence it relied on in granting the motion for new trial:
• One of Dr. McAdoo's experts testified he found hydrosalpinx or pyosalpinx upon reviewing the CT scans reviewed by Dr. McAdoo;
• One of the parents' experts testified to the rarity of pyosalpinx in a child of J.P.H.'s age;
• Testimony from the child's pediatrician supported the allegation that Dr. McAdoo was negligent in failing to include a "more conceivable differential diagnosis" in light of the child's age and history;
• Testimony from the emergency room physician at Doctors Hospital that he asked Dr. McAdoo to review the CT scan for an alternative finding;
• Dr. McAdoo's inability to explain why he failed to include a differential diagnosis of hematosalpinx, which he admittedly considered;
• The "small amount of self-serving, contradictory and conflicting testimony" by Dr. McAdoo was negated by "the exhaustive and consistent proof" showing he inexplicably failed to include a differential diagnosis of hematosalpinx, which fell below the standard of care; and
• Testimony by the parents' expert that the negligence of Dr. McAdoo in not including a differential diagnosis such as hydrosalpinx"may have contributed to the injuries sustained by" J.P.H. by delaying the necessary treatment or by creating a distraction from the actual diagnosis, which would have required urgent care; delaying the surgical procedure that could have prevented the removal of J.P.H.'s fallopian tube and a reduced probability of future fertility.
I do not believe this evidence, particularly when considered with the remaining evidence in the underlying record, supports the granting of a new trial.
Even if I assume the evidence produced by the parents and relied on by the trial court in granting the new trial was factually insufficient with regard to Dr. McAdoo's alleged breach of the standard of care-failure to include in his differential diagnosis something other than pyosalpinx, the evidence is more than sufficient to support a finding that such breach was not the cause in fact of J.P.H.'s injuries.[3] See Bustamante , 529 S.W.3d at 456. In other words, I believe the evidence was sufficient for the jury to conclude that Dr. McAdoo's failure (or refusal) to include another diagnosis such as hydrosalpinx along with his diagnosis of pyosalpinx was not a substantial factor in bringing about the partial loss *596 of J.P.H.'s left fallopian tube, or that if he had included the additional diagnosis, she would not have lost a portion of her fallopian tube. See ids="12386526" index="50" url="https://cite.case.law/sw3d/529/447/#p456">id.
The pathology report from Methodist Children's Hospital stated J.P.H.'s condition was consistent with pyosalpinx or hydrosalpinx. Dr. McAdoo's trial expert agreed based on his review of the CT scan. Thus, several of the doctors involved agreed pyosalpinx was a possibility. Certain doctors thought it was possible J.P.H. was suffering from hydrosalpinx. According to the parents, Dr. McAdoo's refusal to include a diagnosis other than pyosalpinx prevented J.P.H. from receiving surgery in time to save her entire fallopian tube. It was the parents' theory that if Dr. McAdoo had included an additional diagnosis of hydrosalpinx -a diagnosis suggested by the pathology report from Methodist Children's Hospital and Dr. McAdoo's own expert-J.P.H. would not have suffered the partial loss of her fallopian tube, resulting in possible fertility issues in the future. The parents theorized that if Dr. McAdoo had included hydrosalpinx, Methodist Children's Hospital would not have been "distracted" by a diagnosis associated with a sexually transmitted disease, suggesting possible sexual abuse. According to the parents, but for the failure to include additional diagnoses such as hydrosalpinx, there would have been no delay in transfer, no delay in surgery, and no loss of a portion of the fallopian tube. In sum, the parents contend that but for Dr. McAdoo's singular focus on the diagnosis of pyosalpinx, which can be caused by a sexually transmitted disease, Methodist Children's Hospital would not have required a police report and neither the transfer nor the subsequent surgery would have been delayed. The evidence does not bear out this "delay" theory.
There is nothing in the record to show Dr. McAdoo suspected sexual abuse other than his diagnosis of pyosalpinx, and as several doctors admitted, pyosalpinx can be caused by infections other than those associated with a sexually transmitted disease and can be found in children as young as J.P.H. Dr. McAdoo testified he did not call the Laredo Police Department or Child Protective Services, nor did he suggest that anyone else do so. He specifically stated that when interpreting J.P.H.'s CT scan he had no idea it would result in anyone calling the police or CPS. Dr. McAdoo also testified he never told anyone that he thought J.P.H. had a sexually transmitted disease or was suffering from a condition caused by sexual abuse. He also denied that anyone asked that he change his diagnosis. Additionally, the evidence showed Doctors Hospital's Policy on Abuse and Neglect, which sets out a list of conditions that are possible indicators of child abuse, does not include a diagnosis of pyosalpinx.
The undisputed evidence shows J.P.H. was ready for transfer at approximately 1:00 a.m., but upon receipt of the memorandum of transfer, which included Dr. McAdoo's diagnosis of pyosalpinx, Methodist Children's Hospital mandated a police report prior to transfer, resulting in a delay in transfer.[4] A nurse with Doctors Hospital called police and an officer was dispatched just before 2:00 a.m. and arrived just after 2:00 a.m. When speaking to an officer from the Laredo Police Department, a nurse told the officer Doctors Hospital did not in fact suspect abuse; rather, the transferring facility, i.e., Methodist Children's Hospital, required the hospital *597 to open a CPS case and contact police. The emergency room doctor testified he did not think a report was necessary for the transfer. The officer took an "information only" report.
Moreover, the undisputed evidence shows the majority of pre-surgery delay occurred after J.P.H. arrived at Methodist Children's Hospital. J.P.H. arrived at the San Antonio hospital at 5:58 a.m. At 6:22 a.m., the San Antonio treating physician ordered an ultrasound with doppler. However, the ultrasound was not performed until 10:33 a.m.-more than four hours after the doctor's order-and the results, which included a diagnosis of pyosalpinx among other things, were not discussed with J.P.H.'s doctor until 11:40 a.m. At that time, the doctors at Methodist Children's Hospital recommended laparoscopic surgery because it was still unclear what was wrong with J.P.H.
The evidence established J.P.H. was admitted for surgery at 12:32 p.m. However, the surgical process did not begin until 4:06 p.m. when anesthesia was first administered. The actual surgery began at 4:25 p.m., more than ten hours after J.P.H. arrived at Methodist Children's Hospital. There is nothing in the record to establish the surgery would have begun earlier but for Dr. McAdoo's failure to include additional diagnoses beyond pyosalpinx. The radiologist at Methodist Children's Hospital, who included diagnoses of hydrosalpinx and pyosalpinx in his report, presented his findings to the doctors at 11:40 a.m., yet the surgery did not begin until almost five hours later.
It was only during the surgery that the actual cause of J.P.H.'s illness was discovered-a torsed fallopian tube-not pyosalpinxorhydrosalpinx. The twisting of the tube resulted in necrosis "consistent with acute infarction." As set out above, Dr. Hedges, an expert for Dr. McAdoo, explained the fallopian tube had been twisted by an enlarged ovarian cyst, which Dr. McAdoo diagnosed in his preliminary report, causing the tube to move into an abnormal position. Dr. Hedges testified the twisting of the tube caused a "very recent death of the tissue" in the left fallopian tube, probably sometime between the time the ultrasound was conducted at Methodist Children's Hospital and the laparoscopic surgery. Dr. Hedges based his opinion (that neither the twisting of the tube nor the resulting necrosis occurred until sometime after the ultrasound) on the fact that the ultrasound report did not mention any twisting of the fallopian tubes.
Based on the evidence of the delay from the time J.P.H. arrived at Methodist Children's Hospital-or even from the time of the ultrasound-to the surgery, and Dr. Hedges's testimony that the necrosis, which required removal of part of the fallopian tube, occurred sometime after the ultrasound but before surgery, the jury could have concluded that any alleged breach in the standard of care by Dr. McAdoo was not the cause in fact of J.P.H.'s loss of a portion of her fallopian tube.
Moreover, the trial court's own reference to cause in fact in its new trial order belies the propriety of granting a new trial. The trial court stated it relied on testimony from the parents' expert that Dr. McAdoo's negligence in failing to include a differential diagnosis such as hydrosalpinx" 'may have contributed to the injuries sustained by J.P.H." by delaying the necessary treatment or by creating a distraction from the actual diagnosis, which would have required urgent care; delaying the surgical procedure that could have prevented the removal of J.P.H.'s fallopian tube and a reduced probability of future fertility." (emphasis added). "May have" and "could have" are insufficient to *598 establish cause in fact; rather, to prevail in a case such as this, the parents had to prove by a preponderance of the evidence that there was a reasonable medical probability that if Dr. McAdoo had included another diagnosis, e.g., hydrosalpinx, J.P.H. would not have lost a portion of her fallopian tube. See Estate of Milo , 909 S.W.2d at 511 ; W.C. LaRock, D.C., P.C. v. Smith , 310 S.W.3d 48, 57 (Tex. App.-El Paso 2010, no pet.). The parents' expert merely testified Dr. McAdoo's failure to include a diagnosis of hydrosalpinx"may have contributed to" J.P.H.'s injuries-there was no testimony that the failure to include a differential diagnosis of hydrosalpinx or some other condition was a substantial factor in bringing about the loss of J.P.H.'s fallopian tube, and without it, that injury would not have occurred. See Bustamante , 529 S.W.3d at 456.
Proof of cause in fact cannot be based on possibilities. See Jelinek v. Casas , 328 S.W.3d 526, 537, 540 (Tex. 2010). Here, according to the parents' own expert, Dr. McAdoo's alleged breach in failing to include additional diagnoses "may have contributed to the injuries sustained by" J.P.H. by delaying treatment or creating a distraction from the actual diagnosis, which would have required urgent care. Words like "may," "perhaps," and "could" indicate mere conjecture, speculation, or possibility rather than cause in fact based on a reasonable medical probability, and are insufficient to sustain a judgment of medical negligence. LaRock , 310 S.W.3d at 57 (citing Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue , 271 S.W.3d 238, 247 (Tex. 2008) ). Moreover, the evidence shows the ultrasound conducted in San Antonio at 10:33 a.m. showed a diagnosis other than pyosalpinx, and yet surgery did not commence for another six hours. This contradicts any contention that if Dr. McAdoo had included additional diagnoses in his preliminary report, surgery would have commenced immediately.
Based on the evidence referenced by the trial court in its new trial order, the evidence set out above, and all of the evidence in the record, I firmly believe there was sufficient evidence to allow the jury to answer "no" to the question of Dr. McAdoo's negligence. More specifically, there was sufficient evidence from which the jury could have concluded Dr. McAdoo's alleged breach was not the cause in fact of J.P.H.'s injury.
The jury was the sole judge of the credibility of the witnesses and was entitled to believe-based on the evidence of delay between the ultrasound and surgery and Dr. Hedges's opinion-that Dr. McAdoo was not the proximate cause of J.P.H.'s injury. See City of Keller , 168 S.W.3d at 819. The jury's finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and the trial court erred in taking away the jury's failure to find cause in fact simply because it believed the evidence preponderated toward a finding of negligence. See ids="8943104" index="58" url="https://cite.case.law/sw3d/168/802/#p819">id.
CONCLUSION
After conducting a merits-based review of the trial court's articulated reasons for granting the new trial, and considering all of the evidence in the underlying record, I do not believe the record supports the trial court's rationale for granting the new trial. In other words, I believe the record contains sufficient evidence to support the jury's finding in favor of Dr. McAdoo with regard to the parents' claim of negligence. I would conditionally grant Dr. McAdoo's petition for writ of mandamus, order the trial court to vacate its order granting the motion for new trial, and order the trial court to reinstate the take-nothing judgment in favor of Dr. McAdoo. Accordingly, *599 I respectfully dissent to the majority's denial of Dr. McAdoo's petition for writ of mandamus.

A "differential diagnosis" is "the process of differentiating between similar diseases." Differential Diagnosis , Shorter Oxford English Dictionary Vol. I (6th ed. 2007). More specifically, it is defined as the "[i]dentification of a disease by comparison of illnesses that share features of the presenting illness, but differ in some critical ways." Differential Diagnosis , Taber's Cyclopedic Medical Dictionary (21st ed. 2009).

I believe the evidence was sufficient to support a finding of "no breach" as well. Dr. McAdoo's expert testified Dr. McAdoo met the applicable standard of care with regard to the pyosalpinx diagnosis in the preliminary report. He specifically stated there was "nothing lacking in that preliminary report." He also testified that contrary to the parents' claim, Dr. McAdoo included diagnoses other than pyosalpinx, identifying six findings in Dr. McAdoo's preliminary report that could be characterized as differential diagnoses. Additionally, several of the testifying doctors-including the parents' retained expert-admitted that although pyosalpinx is unusual in a child of J.P.H.'s age, it is not unheard of. Moreover, these same doctors testified that pyosalpinx can be caused by infections other than sexually transmitted diseases. Finally, Dr. McAdoo himself testified he acted reasonably and prudently in interpreting J.P.H.'s CT scan.

There is no evidence in the record to establish Methodist Children's Hospital would not have asked for police and CPS reports if Dr. McAdoo had included a diagnosis of hydrosalpinx along with his diagnosis of pyosalpinx.