**Opinion issued December 2, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00443-CV

————————————

**KATHERINE HUNTER, Appellant**

**V.**

**TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY, Appellee**

---

On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Case No. 17-CV-0910

---

## O P I N I O N

Katherine Hunter was hit by a car while walking across the street. She sued

her own insurance company under the underinsured-motorist provision of her policy.

A jury found that the underinsured motorist was mostly to blame for the accident but

awarded no damages. On appeal, Hunter argues that the evidence is legally and factually insufficient to support the award of no damages. We affirm.

## BACKGROUND

The underlying lawsuit arises out of a low-speed automobile-pedestrian collision. The motorist, Lindsey Martin, was initially stopped at a red light. When the light turned green, she turned her car onto the street that Hunter was simultaneously crossing on foot. It is undisputed that Hunter was in a crosswalk and had the right of way. But Martin did not see Hunter in time to avoid hitting her.

Hunter sued Martin for negligence. Hunter also sued her own insurance company, Texas Farm Bureau Mutual Insurance Company, under the underinsured-motorist provision of her automotive policy.

Martin's insurer paid Hunter $50,000, which was the policy limit of Martin's insurance. And Hunter nonsuited her claim against Martin.

Texas Farm Bureau paid Hunter $10,000 under the personal-injury-protection provision of her policy. The parties subsequently tried Hunter's claim for additional damages under the underinsured-motorist provision to a jury. Hunter sought to recover the following categories of damages from Texas Farm Bureau:

- past and future physical pain and mental anguish;
- past and future physical impairment; and
- future medical expenses.

Hunter disclaimed damages for past medical expenses and lost wages.

2

At trial, the parties stipulated that Hunter had underinsured-motorist coverage through Texas Farm Bureau. The severity and cause of her medical conditions were the principal disputed issues before the jury. *See In re Liberty Cty. Mut. Ins. Co.*, 537 S.W.3d 214, 220 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding) (when underinsured-motorist coverage is established, issues in underinsured-motorist suit are essentially those of typical suit involving car accident: motorist's negligence and existence and amount of any damages caused by accident).

Hunter and one of her treating doctors, Christopher Vije, M.D., were the principal fact witnesses. Martin, an accident-reconstruction expert, Hunter's daughter-in-law, and two of Hunter's friends also testified. Finally, two experts, one for each side, testified about Hunter's future medical care and expenses. In addition, the parties introduced more than 1,500 pages of Hunter's medical records into evidence.

The accident took place at the T-intersection of 23rd Street and Harborside Drive in Galveston in mid-August 2015. Hunter was traveling southward on foot, and she intended to cross Harborside Drive to continue southward along 23rd Street. Martin was driving northward on 23rd Street, and she intended to make a left turn onto Harborside Drive. Both Hunter and Martin were waiting for their respective traffic signals to change so that they could proceed through the intersection. When the traffic signals simultaneously changed, the accident at issue unfolded.

At the time of the accident, it was around 5:00 p.m. on a Friday during the tourist season. Traffic was heavy. Hunter testified that she began to cross Harborside Drive in the crosswalk when the signal for pedestrian traffic indicated it was appropriate to do so. Though she looked both ways before entering the crosswalk, she started across quickly because her family was waiting for her. Then Hunter was hit by Martin's car.

Martin was stopped at the red light on 23rd Street. When the light turned green, Martin accelerated and turned onto Harborside Drive, the roadway Hunter was crossing. Hunter testified that she saw Martin start forward. And Hunter assumed Martin was turning onto Harborside Drive but also thought Martin would avoid hitting her in the crosswalk. Unfortunately, that did not happen, as Martin did not see Hunter in time to stop.

The impact knocked Hunter onto the hood of Martin's car. Hunter then fell to the ground. Hunter said that Martin's car was moving slowly at the moment of impact. Hunter's medical records indicate that she told treaters it had been going five miles per hour or less.

Hunter got up, walked back to the curb, and sat down. She called her family on her cell phone to let them know what had happened.

Both Hunter and Martin testified that the accident was Martin's fault. The accident-reconstruction expert testified so as well.

4

At Hunter's request, she was taken to the emergency room by ambulance. Hunter testified that the entire left side of her body hurt, particularly her shoulder, hip, and leg. She rated her pain at a three on a scale of one to ten. Hunter's emergency-room records stated that she did not have any "obvious deformity," "signs of obvious trauma," or "obvious injuries or external bleeding." Hunter was x-rayed from shoulder to feet, and the tests showed nothing was dislocated or fractured. The x-rays did show that Hunter, who was in her early 60s at the time, had some mild arthritic changes. A doctor prescribed Hunter a painkiller, Tramadol, and the emergency room discharged her without further treatment.

Hunter remained on vacation in Galveston over the next several days. She spent most of her time relaxing at the condominium her family had rented. But she dined out at a restaurant Saturday evening. And on Monday or Tuesday, she went to Schlitterbahn, where she floated on an innertube. Hunter never filled the painkiller prescription. She regularly took an over-the-counter painkiller, Advil, instead.

A couple of weeks later, in late August, Hunter saw her primary care doctor. Hunter testified that she was still "really sore," "bruised," and "swollen" but thought that she only had "soft tissue" injuries. Hunter's doctor told her to wait and see how she was in a month's time.

Hunter testified that she was still in pain a month later and has been ever since. So, over the next three and half years or so, Hunter sought and received medical care

from several doctors. These doctors administered a number of diagnostic tests and treated Hunter for multiple medical conditions. Of particular significance, Hunter underwent the following tests and treatments:

- in October 2015, an MRI and arthrogram of her shoulder showed a partial tear in her rotator cuff and mild degenerative changes;

- in November 2015, she had arthroscopic surgery to repair her shoulder;

- in March 2016, MRIs of her hip and leg showed mild inflammatory changes consistent with tendinopathy and trochanteric bursitis as well as mild degenerative changes; and

- in April 2016, she had arthroscopic surgery with a trochanteric bursectomy to repair her hip.

Hunter attributed the pain in her shoulder, hip, and elsewhere to the accident, testifying that she did not have any pain beforehand. But some of her medical records contradict her account. For example, a 2010 record shows that Hunter reported recurrent back pain. A 2014 record shows she reported leg cramps while walking in addition to recurrent back pain.

Hunter stated that the shoulder surgery was a success. But she testified that she continued to have pain in her hip and leg even after the hip surgery and physical therapy. Thus, she sought more testing and treatment.

In January 2017, one of Hunter's doctors, an orthopedist, ordered an MRI of her lumbar spine to determine if spinal issues could be the source of her ongoing pain. The MRI showed mild disc desiccation and degenerative disc changes. The next month, a pain management specialist to whom Hunter had been referred and

6

who had administered the lumbar spine MRI, diagnosed her with gluteal tendinitis. The pain management specialist concluded her tendinitis was not secondary to anything and attributed her spinal issues to age.

Hunter continued to have pain in 2018. As of the time of trial, she was taking the prescription drug Lyrica to manage her pain. She said the drug reduced her pain to a one or two on a scale of ten.

While Hunter continues to walk or hike, she testified that her ongoing pain prevents her from doing so for the same amount of time or distance or with the same frequency or vigor that she could before the accident. Hunter's daughter-in-law and friends corroborated that she has been less capable of physical exertion since the accident.

Of Hunter's healthcare providers, Vije was the only one who testified at trial, and his testimony was admitted via videotaped deposition. He is a doctor who specializes in interventional pain management, a subspecialty of anesthesiology. The basic goal of this subspecialty is to identify why a patient is experiencing pain and ameliorate that pain through minimally invasive treatment.

Vije stated he knew little about the accident. What little he knew about it, he learned from Hunter. According to Vije, his job was to investigate the source of Hunter's pain and treat the medical condition causing the pain, not to identify the ultimate cause of the medical condition itself.

Vije first saw Hunter in June 2017. Among other things, Vije administered several epidural steroid injections intended to alleviate Hunter's back pain. The first shot, administered in June, gave Hunter a lot of relief, and she continued to do well for another three-and-a-half months or so. But the initial shot did not provide long-term pain relief. So, Vije administered two more shots, one in November and another in December 2017, but neither one gave Hunter "the same relief" that the first shot had.

After the unsuccessful epidural injections, in 2018, Vije began to investigate whether Hunter's hip could be responsible for her pain. Vije administered a Botox injection to the left piriformis muscle of Hunter's buttocks in February 2018, but it did not give her enough relief. So, in June 2018, he administered a combined injection to Hunter's left piriformis and gluteal muscles. This gave Hunter limited relief for a couple of months.

Because Vije was unable to relieve Hunter's pain, he referred her to a surgeon. The last time Vije saw Hunter was in October 2018. He did not have any further appointments with her scheduled as of trial.

In November 2018, the surgeon administered a myelogram—a spinal imaging test—as well as x-rays and a CT scan to assess Hunter's suitability for surgery. The surgeon decided that the results did not warrant surgery. He diagnosed Hunter with degenerative spondylolisthesis, a condition in which arthritis builds up in joints and

can irritate adjacent nerves and cause pain. His assessment was that Hunter's spondylolisthesis was primary, meaning that it resulted from degeneration over time, rather than having resulted from trauma.

For his part, Vije generally agreed that spondylolisthesis often "is from arthritis," not trauma. Vije said this condition frequently develops without cause. As to Hunter's spondylolisthesis in particular, Vije testified that he did not know what caused it and did not think it possible to know.

Asked if he could do more for Hunter's pain, Vije testified it was hard to say. He stated that Hunter is "getting to the point where we've ruled out most things organic or fixable" but might be a candidate for a neurostimulator, an implanted medical device that blocks pain. A neurostimulator would likely be his next recommendation. But he also has not had a formal conversation with Hunter about a neurostimulator, and a surgeon ultimately would be the decisionmaker as to its suitability.

As to causation, Vije did not offer an opinion. He testified that Hunter's various medical conditions were consistent with trauma, like a car accident. But he agreed that her conditions could have arisen from nontraumatic causes too, like preexisting arthritis and degenerative changes that are a part of the ordinary aging process. According to Vije, people start developing arthritis in their 30s and may have developed a fair amount of arthritis by their 60s. Vije further agreed that a

person's inability to be as active as she ages is unsurprising, even absent trauma. He testified that he did not know what specific medical condition was responsible for Hunter's continuing pain.

Vije stated he did not see anything in Hunter's medical records suggesting her conditions predated the accident. But he conceded he had only reviewed the records in his possession, not her complete medical records. For example, he did not have her emergency-room records.

The jury found that both Hunter and Martin negligently caused the accident, and it assigned 20 percent of the fault to Hunter and 80 percent to Martin. But the jury awarded no damages, specifically finding that Hunter was not entitled to any damages for past and future physical pain and mental anguish, past and future physical impairment, or future medical expenses.

Hunter moved for a new trial arguing that the jury's award of zero damages was against the great weight and preponderance of the evidence. Texas Farm Bureau opposed the motion on the ground that the jury could have reasonably found that the accident did not cause Hunter's injuries.

The trial court granted Hunter a new trial. The trial court stated that because the jury found Martin to be 80 percent at fault, "Texas law required" the jury to award "at least some non-economic damages for past and future physical pain and mental anguish, past and future physical impairment, and future medical expenses."

10

The trial court also stated that the jury's "finding of zero damages is against the great weight and preponderance of the evidence."

Texas Farm Bureau petitioned for a writ of mandamus. We conditionally granted the writ, holding that the trial court's new-trial order was facially invalid because Texas law did not require the jury to award damages and the order did not adequately explain why the evidence was factually insufficient to support the jury's verdict. *In re Tex. Farm Bureau Mut. Ins. Co.*, No. 01-19-00742-CV, 2020 WL 573249, at *4 (Tex. App.—Houston [1st Dist.] Feb. 6, 2020, orig. proceeding) (mem. op.). Because the order was invalid, we did not consider whether the evidence was factually insufficient to support the verdict. *Id.* at *4 n.3.

The trial court then vacated its new-trial order, and it rendered a take-nothing judgment in Texas Farm Bureau's favor based on the jury verdict.

Hunter appeals.

## DISCUSSION

In a single issue, Hunter contends that the evidence is legally and factually insufficient to support the jury's award of zero damages. She requests that we reverse the trial court's judgment and remand the cause to the trial court for a new trial.

## I. Legal Sufficiency

Texas Farm Bureau argues that we should not address the legal sufficiency of the evidence for two independent reasons. First, it argues that Hunter did not

preserve this issue for appeal because she did not raise the issue in her motion for new trial. Second, it argues Hunter cannot challenge an award of zero damages for physical pain and mental anguish, physical impairment, and future medical expenses for legal insufficiency because these damages are inherently speculative in nature and their amount therefore cannot be conclusively proved.

## A. Error preservation

When the parties try their dispute to a jury, they cannot contend on appeal that the evidence is legally insufficient to support a judgment rendered on the verdict unless they preserve this issue in the trial court. *See* TEX. R. APP. P. 33.1(d). The parties may preserve a legal insufficiency issue in the trial court by making:

- a motion for an instructed verdict;
- an objection to the submission of a jury question;
- a motion for judgment notwithstanding the verdict;
- a motion to disregard the jury's answer to a vital fact question; or
- a motion for a new trial.

*Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *Roberson v. Collins*, 221 S.W.3d 239, 241–42 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Hunter did not move for an instructed verdict, object to the submission of a relevant jury question, move for judgment notwithstanding the verdict, or move to disregard the jury's answer to a vital fact question. Hunter did move for a new trial. In Hunter's new-trial motion, she argued the evidence "at trial conclusively

12

establishes that the jury's findings as to the measure of damages is so against the great weight and preponderance of the evidence as to be manifestly unjust."

Hunter's claim that the jury's finding of zero damages is against the great weight and preponderance of the evidence challenges the factual sufficiency of the evidence, not its legal sufficiency. *See Ononiwu v. Eisenbach*, 624 S.W.3d 37, 44 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (claim that award of no damages was against great weight and preponderance of evidence challenged factual sufficiency). Though Hunter's use of the phrase "conclusively establishes" ordinarily might suggest a legal sufficiency challenge, it does not do so in this instance. In her motion for new trial, Hunter argued she had "conclusively established that she suffered objective injuries," which entitled her to an award of damages in some unspecified amount. She did not argue that she had conclusively proved damages in a particular amount. Further, she sought a new trial, not rendition of a judgment for damages in a particular amount. Viewed in the context of her claim that the jury's finding of zero damages is against the great weight and preponderance of the evidence, Hunter's request for a new trial, rather than the entry of judgment notwithstanding the jury's verdict, reinforces that her motion challenged the factual sufficiency of the evidence, not its legal sufficiency. *See Benavente v. Granger*, 312 S.W.3d 745, 747–48 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (remand for new trial is remedy for factual insufficiency of evidence).

Because Hunter did not challenge the legal sufficiency of the evidence in her motion for new trial, she did not preserve this issue for our review. *See Cecil*, 804 S.W.2d at 510–11; *Roberson*, 221 S.W.3d at 241–42; *see also Hardy v. C.P.I. Sales*, 511 S.W.2d 89, 93 (Tex. App.—Houston [1st Dist.] 1974, no writ) (legal and factual sufficiency challenges must be stated in distinct language in motion for new trial and challenge limited to one cannot be enlarged to encompass both on appeal).

## B.     Damages incapable of conclusive proof

We acknowledge that there is authority supporting Texas Farm Bureau's position that a jury's award of zero damages for physical pain, mental anguish, and physical impairment is not susceptible to legal sufficiency review because these types of damages are inherently speculative, and their amount therefore lies within the jury's discretion. *E.g.*, *McDonald v. Dankworth*, 212 S.W.3d 336, 346 n.12 (Tex. App.—Austin 2006, no pet.); *Pilkington v. Kornell*, 822 S.W.2d 223, 225 n.1 (Tex. App.—Dallas 1991, writ denied); *Martin v. Warren & Miller Co.*, 639 S.W.2d 706, 707 (Tex. App.—Tyler 1982, no writ). But, to our knowledge, we have not said so. *Cf. Jimenez v. Rodriguez*, No. 01-98-00293-CV, 1999 WL 213096, at *4–7 (Tex. App.—Houston [1st Dist.] Apr. 15, 1999, pet. denied) (op., not designated for publication) (reviewing award of zero damages for physical pain, mental anguish, and physical impairment for legal and factual sufficiency without addressing whether legal sufficiency review was proper); *see also Mora v. Wine*, No. 05-19-

14

00874-CV, 2021 WL 71431, at *5–8 (Tex. App.—Dallas Jan. 8, 2021, no pet.) (mem. op.) (same). Moreover, we are unaware of any authority on this subject as to future medical expenses. Because Hunter did not preserve her legal sufficiency challenge, we need not resolve these issues today. *See* TEX. R. APP. P. 33.1(a) (party must preserve error in trial court to present complaint for appellate review).

## II.  Factual Sufficiency

### A.  Standard of review

When, as here, a party argues the evidence is factually insufficient to support an adverse jury finding on an issue on which she bore the burden of proof at trial, like the damages she sought to recover, we can set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence as to make the finding clearly wrong and unjust. *Ononiwu*, 624 S.W.3d at 44. We consider all the evidence. *Capcor at KirbyMain v. Moody Nat'l Kirby Houston S*, 509 S.W.3d 379, 384 (Tex. App.—Houston [1st Dist.] 2014, no pet.). But we cannot set aside a finding merely because we would have weighed the evidence differently or made a different finding. *Ononiwu*, 624 S.W.3d at 44. The jury weighs the credibility of the witnesses and resolves evidentiary conflicts. *Id.*

### B.  Applicable law

A jury generally has great discretion in evaluating evidence of damages. *Huston v. United Parcel Serv.*, 434 S.W.3d 630, 640 (Tex. App.—Houston [1st

15

Dist.] 2014, pet. denied). This is especially true of damages for physical pain, mental anguish, and physical impairment, which are inherently speculative in nature. *See Ononiwu*, 624 S.W.3d at 44 (saying so as to physical pain and physical impairment); *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (saying so as to pain, suffering, mental anguish, and disfigurement). Due to the speculative nature of these categories of damages, a jury may decline to award these damages even when an injury is proved or undisputed under certain circumstances. *See Ononiwu*, 624 S.W.3d at 44.

We must evaluate the factual sufficiency of the evidence supporting a particular damages finding on a case-by-case basis. *See Figueroa*, 318 S.W.3d at 62. Nonetheless, we have recognized at least two sets of circumstances in which a jury's failure to award damages for physical pain, mental anguish, and physical impairment generally is not against the great weight and preponderance of the evidence.

First, we will affirm a jury's decision not to award these types of inherently speculative damages when the evidence of a plaintiff's injuries is more subjective than objective in nature. *Ononiwu*, 624 S.W.3d at 44. For example, the evidence of an injury is more subjective in nature when the injury's existence and symptoms largely depend on the plaintiff's word, rather than medical testing that yields reasonably certain results. *See, e.g.*, *id.* at 45–46 (evidence was more subjective than objective given that lone objective evidence of injury was plaintiff's x-rays and

MRIs, which were inconclusive, and remaining evidence of injury consisted of plaintiff's testimony and medical records reflecting what he told his treaters). The jury has the latitude to decline to award damages for physical pain, mental anguish, and physical impairment under these circumstances because their existence effectively turns on the plaintiff's credibility. *See id.* at 46. And the evaluation of the credibility of the plaintiff and other witnesses is the sole prerogative of the jury. *See id.* (jury is sole judge of credibility and may disbelieve subjective testimony).

Second, we will affirm a jury's decision not to award these types of inherently speculative damages when the jury could have reasonably found based on the evidence as a whole that the plaintiff's injuries were less severe than alleged or the defendant did not cause the plaintiff's injuries. *Id.* at 45. When there is conflicting evidence about the severity or cause of the plaintiff's injuries, it is the jury's role to resolve the evidentiary conflicts and decide which version of the evidence to accept. *Huston*, 434 S.W.3d at 641. Thus, even when both subjective and objective evidence of physical pain, mental anguish, or physical impairment exist, the jury may decline to award any such damages based on its conclusion that the defendant is not responsible for them. *See, e.g.*, *Ononiwu*, 624 S.W.3d at 46–47 (affirming award of zero damages for physical pain and physical impairment in part because jury reasonably could have found that accident was minor, plaintiff's injury was less

severe than he claimed, and defendant did not cause plaintiff's injury even though plaintiff received treatment and incurred more than $25,000 in medical bills).

### C. Analysis

Hunter argues that the evidence of her injuries—Vije's testimony and her medical records in particular—is more objective than subjective. Thus, she maintains, the jury was required to award her some amount of damages for physical pain and mental anguish, physical impairment, and future medical expenses.

While we do not disagree with Hunter's contention that she introduced ample objective evidence of the medical conditions for which she tried to recover damages, we nonetheless disagree that the jury was required to award some damages. Based on the record as a whole, we conclude the jury could have reasonably found that Hunter's injuries from the accident were less severe than she alleged, and that the accident did not cause the damages that Hunter sought to recover. Thus, the jury was not required to award her damages given the facts of this case.

In some cases, an accident victim's injuries are so manifest and severe that a jury cannot reasonably find she did not suffer pain, anguish, and impairment, notwithstanding the speculative nature of these types of damages. For example, in *Doctor v. Pardue*, we reversed an award of no damages for pain and impairment, given that the plaintiff was rendered a quadriplegic in an aircraft collision on a

runway. 186 S.W.3d 4, 7, 18–21 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). While we reviewed the entire record, an injury like quadriplegia speaks for itself.

But this is not the type of case in which the victim's injuries are so manifest or severe that compensable pain, anguish, and impairment are self-evident. Hunter was hit by a car traveling at a low speed, which she estimated at five miles per hour or less. Hunter testified that the left side of her body hurt, particularly her shoulder and hip. But neither she nor Martin, the only eyewitnesses who testified, testified to any manifest or severe injury. When Hunter went to the emergency room afterward, her x-rays showed that nothing was dislocated or fractured. Hunter's emergency-room records reported that Hunter did not have any "obvious deformity," "signs of obvious trauma," or "obvious injuries or external bleeding." These records additionally indicated that Hunter reported her pain as a three on a scale of one to ten. A doctor prescribed Hunter a painkiller, and the emergency room discharged her without further treatment.

Hunter did not fill the prescription for the painkiller. Though she generally took it easy in the days immediately following the accident, she did not cut short her family vacation. Hunter dined out at a restaurant for dinner the day after the accident. Within three or four days, she and her family visited a waterpark, where she floated on an innertube.

After Hunter returned home from vacation, she saw her primary care doctor. At the time of this appointment, which was about two weeks after the accident, Hunter believed her injuries "were soft tissue issues." She was still bruised, sore, and swollen. But after an examination, Hunter's primary care doctor did not think any immediate treatment was warranted and told Hunter to return in a month if her symptoms persisted.

In other words, within a month-and-a-half or so of the accident, the lone objective evidence—Hunter's emergency-room x-rays—showed no injury. The remainder of the evidence from this period is subjective in nature, consisting of Hunter's testimony about her condition and pain. Hunter stated she treated her pain by resting and regularly using an over-the-counter painkiller. Based on these circumstances, the jury reasonably could have concluded that the accident did not cause Hunter any immediate injury compensable by damages for pain, anguish, or impairment. *See, e.g.*, *Ononiwu*, 624 S.W.3d at 45–47 (holding that jury could have reasonably discounted evidence of pain, given that it consisted of plaintiff's testimony and statements he made to doctors, apart from x-ray and MRI findings that weren't definitive and chiropractor's testimony about those findings).

Of course, the first month-and-a-half or so is not the entire story. Hunter maintains that her symptoms persisted afterward. Accordingly, she sought further testing and treatment. She eventually had a surgery that eliminated her shoulder pain.

20

She later had hip surgery, but it did not resolve the pain she was experiencing in her hip and leg. Based on further testing and treatment, Hunter attributes her continuing hip pain to a spinal issue. She argues that the evidence she introduced at trial about these conditions proves the accident caused them. Hunter further argues that the jury's award of zero damages is against the great weight and preponderance of the evidence.

But the evidence of causation is less compelling than Hunter advocates. Hunter testified she did not have shoulder or hip pain before the accident and could engage in more strenuous physical activities beforehand. Without more, however, her testimony about this sequence of events is not evidence of causation. *Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007); *see also Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) (cautioning against acceptance of fallacy that earlier events caused later ones merely because they happened first).

Vije is the lone doctor whose testimony was admitted at trial. He testified as one of Hunter's treating doctors, not as an expert witness on causation. Vije first began treating Hunter in June 2017, about a year and nine months after the accident. His knowledge of the accident was based solely on Hunter's account, and he testified that she told him little about it. He did not perform either of her surgeries. His own practice focuses on "interventional pain management," which he described as "a subspecialty of anesthesiology" that provides "minimally invasive treatment for

21

either acute or chronic pain conditions." Though Vije agreed that Hunter's medical conditions could have been caused by a traumatic injury, like being hit by a car as a pedestrian, he did not testify to a reasonable degree of medical probability that the accident did cause any of her conditions or associated pain.

Notably, Vije's first appointment with Hunter took place about a year-and-a-half after her successful November 2015 shoulder surgery. Thus, he did not treat her for shoulder pain. As Vije testified, he did not independently evaluate this injury:

Q. So—okay. So, did you understand that Ms. Hunter had some treatment to her shoulder?

A. She told us that. She told us that she had an arthroscopic debridement for some kind of rotator cuff injury. But apparently that was—she never complained of that when we were seeing her. So I assume that went well.

Q. Yeah, that was going to be my next question. Did—when she came in, did she complain to you about pain in her shoulder?

A. No.

Q. That's something that she was able to get treatment for, able to get surgery for and—

A. Presumably was fine. I mean, it never came up.

Counsel nonetheless questioned Vije about the possible causes of Hunter's shoulder injury. But Vije's answers to these questions were far from definitive:

Q. Would the type of [shoulder] surgery that was done here, would—could that be caused by trauma?

A. So, the labral tear could. There's a lot—traumatic labral tears are common. The AC joint almost sounds kind of arthritic to me. So, I don't know if that's necessarily a trauma thing. And I guess she

22

could have had—it says debridement. So, I'm thinking that means there must have been spurs, which typically means that there's arthritis in the AC joint. So, that would have been preexisting to an accident. But certainly a rotator cuff injury and a labral tear could be traumatic.

Q. Is it—and when we talk about trauma, again, being struck by a car can cause that?

A. Yeah.

Q. Especially on—if you're struck on the left side?

A. Sure. Because something might have happened, and that labrum might have popped or something.

Q. And then, you know, for the things that are in there, like debridements and—what was the other thing you said that could have been like an arthritic change or something that could have been preexisting?

A. That—that was the main one, the AC joint. If she had arthritis in the AC joint. So, the labrum and the rotator cuff could be traumatic.

Q. Do you ever see situations where people will have like an arthritic condition but it's not causing them pain, and then, they have some type of trauma, and then, they have a change pain-wise?

A. Yes.

Q. How does that occur?

A. That actually happens all the time. So, you have people that have either degenerative conditions, arthritic conditions that are relatively silent during their normal day-to-day activities, and then, there's some kind of event, traumatic event, and all of a sudden that lights up and then they're symptomatic. So, that happens all the time. And that doesn't have to be a car accident. That could be anything. Just lifting a heavy box or something.

Q. Falling on your shoulder?

A. Falling over, right.

23

On its face, the phrasing of Vije's answers—"could be traumatic," "something might have happened," "might have popped or something," "could be anything"—signals uncertainty about what happened in Hunter's particular case. *See, e.g.*, *Johnson v. Harris*, 546 S.W.3d 293, 304 (Tex. App.—El Paso 2017, no pet.) (phrases like "might" and "could" signal possibility, not reasonable medical probability). At the least, the jury reasonably could have discounted this uncertain testimony. *See Ononiwu*, 624 S.W.3d at 45 (jury is free to disbelieve expert testimony).

In Vije's testimony about Hunter's various other medical conditions, he relied on objective evidence for their existence. For example, Vije testified that:

- an MRI showed a separation between one of Hunter's facet joints—a joint connecting spinal vertebrae;

- an EMG confirmed that Hunter had a chronic problem in this same area of the spine; and

- an MRI of Hunter's hip showed she had a gluteus tear.

But Vije merely agreed that these conditions "could be caused by trauma," such as "when you're hit by a car and you're a pedestrian." Similarly, he agreed that these conditions were "consistent with" being hit by a car. Standing alone, Vije's testimony about causation, couched as it is in terms like "could be" and "consistent with," is equivocal because these terms do no more than suggest it is possible that the accident caused Hunter's conditions. *See, e.g.*, *W.C. LaRock, D.C., P.C. v. Smith*, 310 S.W.3d 48, 58 (Tex. App.—El Paso 2010, no pet.) (phrases like "perhaps," "possibly," "can," and "could" indicate possibility rather than reasonable medical

24

probability); *Smith v. Landry's Crab Shack*, 183 S.W.3d 512, 515 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (doctor's testimony that becoming ill enough to be admitted to hospital within ten hours of meal was in reasonable medical probability "consistent with" foodborne illness was not evidence that meal at issue caused illness in question). At the least, the jury could have reasonably found that this equivocal testimony was unpersuasive as to causation. *See Ononiwu*, 624 S.W.3d at 45 (jury is free to disbelieve expert testimony).

Vije testified that he had not seen any medical records indicating Hunter's medical conditions preexisted the accident. This could be understood to raise an inference that the accident must have caused them. But Vije conceded he had not reviewed Hunter's complete medical records, including her emergency-room records. In other words, unlike a case in which an expert opines that a patient's medical history definitively excludes all other possible causes, Vije merely stated that the limited records he had did not suggest another cause. Thus, the jury could have reasonably discounted Vije's testimony that he had not seen any indication in Hunter's records that her conditions preexisted the accident. *See In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 257, 265–66 (Tex. App.—Fort Worth 2016, orig. proceeding) (holding jury could have reasonably found accident did not cause injuries even though one treater testified otherwise, in part because treater had not reviewed some relevant medical records and other evidence).

At any rate, Vije contradicted himself by acknowledging other possible causes. For example, as to Hunter's shoulder, he agreed she had some preexisting arthritis. As noted, he also stated that her shoulder issues need not have resulted from trauma and could be caused by something as simple as lifting a heavy box. Similarly, with respect to Hunter's spine, Vije testified that x-rays and MRIs showed some degenerative changes, which are not unusual for a person of Hunter's age, given the ordinary wear and tear associated with the aging process. Vije agreed that he could not exclude the possibility that Hunter's degenerative spinal changes resulted from arthritis instead of trauma. Vije's testimony on this subject is especially uncertain:

Q. So, standing here—sitting here today though, you can't say with a certain degree of medical certainty that there was no arthritis buildup that caused the degenerative spondylolisthesis?

A. No.

Q. It could have been a buildup of arthritis, right?

A. Yes.

Q. It could have been trauma in 2015?

A. Right.

Q. It could have been some other trauma way back when—earlier than the accident, right?

A. Right. It could have also been some arthritis that was there that accelerated after trauma in 2015. So, it could be none or a combination of those three things.

Q. Exactly. The—we don't know, though?

A. We don't know.

26

Q. You don't know.

A. I don't know. And I don't think anyone can know.

Moreover, Dr. Craig Kuhns, the surgeon who diagnosed Hunter as suffering from spondylolisthesis, was of the opinion that Hunter's spondylolisthesis was primary, meaning it occurred on its own as a result of degeneration over time, not as a result of trauma. Vije acknowledged that this was Kuhns's diagnosis.

As a treating doctor, Vije did not have to disprove or discredit every possible alternative cause of Hunter's medical conditions to testify about causation to a reasonable medical probability. *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010). But when, as here, a doctor concedes that plausible alternative causes exist and disclaims the ability to discern which of these alternatives caused his patient's conditions, a jury may reasonably discount his testimony about causation. *See Coastal Tankships v. Anderson*, 87 S.W.3d 591, 605 n.25 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (alternative causes suggested by defendant may affect weight jury gives to expert's causation testimony). Under circumstances like these, the jury's award of zero damages is not against the great weight and preponderance of the evidence. *See Hyler v. Boytor*, 823 S.W.2d 425, 427–28 (Tex. App.—Houston [1st Dist.] 1992, no writ) (affirming award of zero damages for physical pain and mental anguish when jury could have attributed objective evidence of injury to causes other than automobile accident at issue).

27

Hunter also relies on her medical records from other treating doctors. She argues that these records establish that the accident caused her medical conditions.

We do not agree. Hunter's medical records often refer to the accident. But Hunter herself is almost always the source of this information. For example:

- a September 2015 psychotherapy note states patient "reported she was hit by a car" and "described physical pain and limits in functioning/activity";

- September and October 2015 progress notes state patient presented with multiple complaints, as "she was hit by a car" in August;

- a May 2016 initial evaluation record for physical therapy states "Mechanism of Injury: August 14, 2015. Hit by car as pedestrian";

- a September 2016 progress note states "patient feels most of her complaints are related to a motor vehicle accident" in 2015;

- a February 2017 progress note states patient's back and hip pain "started after a motor vehicle accident" that "was a low speed impact reportedly";

- a March 2017 progress note states that "patient is status post a car accident that apparently caused a gluteal tendinopathy" and includes the additional notation "What caused the pain? Accident";

- a May 2017 initial evaluation record for physical therapy states "Mechanism of Hip Injury: Trauma. Hit by a car" in 2015;

- a June 2017 record indicates patient's back and hip pain began in August 2015 after being "hit by car and thrown up on the windshield";

- an October 2017 record states "patient came in with an acute radiculopathy after having an auto/pedestrian accident";

- a March 2018 initial evaluation record for physical therapy states "Onset Due To: Motor Vehicle Accident" concerning hip injury; and

- September and December 2018 progress notes state patient "developed low back pain" after she "was hit, auto-pedestrian."

28

On their face, these cursory references do not represent opinions by treaters that, to a reasonable medical probability, the accident caused Hunter's medical conditions. Instead, these references reflect information Hunter provided to her treaters.

Information of this kind, related by a patient to her doctors when seeking treatment and documented in her medical records, is generally admissible. TEX. R. EVID. 803(4), (6), 805. But this information is not necessarily probative of causation. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995) (statements in medical records that reflected patient's recitation of history and his own opinions were not evidence of causation). Assuming for argument's sake that the information Hunter conveyed to her doctors about the accident has some evidentiary value in this instance, the jury was not bound to accept her representations about the nature of the accident or the accident's alleged role in causing her medical conditions or their symptoms. *See Ononiwu*, 624 S.W.3d at 46 (jury could disbelieve statements attributable to plaintiff contained in medical records of his treating physicians); *LMC Complete Auto. v. Burke*, 229 S.W.3d 469, 479 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (credibility of medical history given to doctor by patient presents fact issue that goes to weight of evidence, which is for jury to evaluate).

For their part, Hunter's treaters were primarily concerned with identifying the source of her pain and treating it, not ascertaining whether the accident at issue caused her underlying medical conditions. Vije explicitly said so. Hunter agreed that

her doctors were trying to address her symptoms rather than speculating about the ultimate cause of her medical conditions. When viewed in this context, the jury could have reasonably found that the aforementioned statements about the accident contained in Hunter's medical records were not persuasive evidence that, in reasonable medical probability, the accident caused her medical conditions. *See Burroughs Wellcome Co.*, 907 S.W.2d at 500 (holding it was unreasonable to view statements in medical records as expert causation opinions).

There is one medical record that materially differs from all the others. In a February 2017 progress note, Ralph Menard, a medical doctor specializing in pain management, made the following assessment of Hunter's conditions and their causes:

> This patient complains of left-sided hip and leg pain since she was struck by a motor vehicle while in the crosswalk as the car was making a left-hand turn. This was a slow speed collision with no fractures although apparently there was a left rotator cuff and some trochanteric bursitis. As far as her spine all I really see are age related problems. I cannot truthfully say that anything I see in the spine is related to the accident. It is certainly possible that the gluteal tendinitis was related to the collision as she was struck on the left side. As to her assertions that prior to this accident she was hiking in the mountains in Washington but now she can't, certainly a component to her ailments with the rotator cuff tear and the gluteal tendinitis are related to this accident but on the other hand she is getting older and there is a significant component of age-related infirmity that we all experience. However sometimes it is like the proverbial "it's the straw that broke the camel's back" scenario that brings aging to the forefront. Hopefully this injection today will provide the relief of the tendinitis. If not, the only other options I have for her is a platelet rich plasma/stem cell injection in the same locale and time with resolution of this lawsuit.

This single record, however, does not alter the factual sufficiency of the evidence. At best, this record is a mixed bag as to causation. The phrases "patient complains" and "her assertions" indicate that Hunter supplied the information about the accident and its ostensible role in causing her conditions. Menard's statement that "apparently there was a left rotator cuff and some trochanteric bursitis" as a result of the accident does not signal an independent evaluation of causation; instead, the wording of this statement serves as an acknowledgment that the doctor assumed certain facts to be true. *See* NEW OXFORD AMERICAN DICTIONARY 75 (3d ed. 2010) ("apparently" means "as far as one knows or can see" and is "used by speakers or writers to avoid committing themselves to the truth of what they are saying"). Menard stated that Hunter's spinal issues were attributable to age, not the accident. The remainder of his opinions, expressed in equivocal language like "certainly possible" and "sometimes," are speculative. *See, e.g.*, *W.C. LaRock*, 310 S.W.3d at 58 (certain types of phrases—"perhaps," "possibly," "can," and "could," for example—express mere possibility rather than reasonable medical probability).

Moreover, to the extent this particular medical record, or any other, arguably could be construed as offering a treater's opinion that the accident caused Hunter's conditions, such an opinion is not competent evidence of causation unless it is accompanied by an adequate explanation of the basis for the opinion. *See Burroughs Wellcome Co.*, 907 S.W.2d at 500 (expert opinions stated in medical records are

31

subject to same requirements as opinions stated in testimony); *Minn. Min. & Mfg. v. Atterbury*, 978 S.W.2d 183, 199 (Tex. App.—Texarkana 1998, pet. denied) (expert's recitation that he examined patient and took history of patient does not constitute sufficient basis for causation opinion absent explanation of exact methodology expert used to arrive at his opinion, including discussion of other possible causes he ruled out and literature on which he relied). None of Hunter's treaters other than Vije testified at trial, so the record lacks an explanation for any causation opinions these other treaters, like Menard, ostensibly held. Assuming for argument's sake that Menard's purported causation opinion, or any other in Hunter's medical records, has any probative value whatsoever, the jury was not obliged to accept them at face value under the circumstances or to credit them over conflicting causation evidence, like Vije's testimony that Hunter's conditions could have been caused by the accident, arthritis, or something else. *See Thota v. Young*, 366 S.W.3d 678, 695–96 (Tex. 2012) (jury assesses weight and credibility of expert witnesses and may choose to believe one expert's opinion and discount another expert's conflicting opinion).

In sum, when all the evidence is considered in a neutral light, the jury's finding that Hunter had zero damages for physical pain, mental anguish, and physical impairment is not so against the great weight and preponderance of the evidence as to make the finding clearly wrong and unjust. In particular, we conclude the jury

could have reasonably found from the evidence as a whole that Hunter did not prove by a preponderance of the evidence that the accident caused these damages.

The same is true of the jury's finding that Hunter had zero damages for future medical expenses. A plaintiff must prove the accident at issue caused her medical conditions to recover medical expenses. *JLG Trucking v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). Because the jury could have reasonably found from the evidence as a whole that Hunter did not prove by a preponderance of the evidence that the accident at issue caused her medical conditions, the jury's finding that she had zero damages for future medical expenses is not so against the great weight and preponderance of the evidence as to make the finding clearly wrong and unjust.

Under these circumstances, the jury could have awarded some compensation to Hunter for expenses she incurred in seeking enough medical care to confirm that she was not seriously injured by the accident. *Ononiwu*, 624 S.W.3d at 47. But Hunter disclaimed any such damages by declining to seek past medical expenses.

## CONCLUSION

We affirm the trial court's judgment.


Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Countiss.

33